## UNITED STATES DISTRICT COURT FOR
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| **Connelly Development, LLC,** ) <br> 5530 Bush River Road ) <br> Columbia, SC  29212-3007, ) <br> ) <br> **Tanners Crossing, LP,** ) <br> 5530 Bush River Road ) <br> Columbia, SC 29212-3007, ) <br> ) <br> **Janice Davis**, an individual residing in ) <br> West Columbia, South Carolina, ) <br> ) <br> and ) <br> ) <br> **National Association of Home Builders** ) <br> **of the United States,** ) <br> 1201 15th Street, NW ) <br> Washington, D.C. 20005, ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> **City of West Columbia,** ) <br> ) <br>      Defendant. ) | **AMENDED COMPLAINT** <br><br> **(Jury Trial Demanded)** <br><br> **Case No. 3:05-cv-00460-MJP** |

### I.

### INTRODUCTION

1.     This action is brought under the Fair Housing Act of 1968, 42 U.S.C. § 3601, *et seq.* ("FHA or the "Act").  Congress enacted the FHA to ensure that certain protected classes, including racial minorities, are not the victims of discrimination in the sale or rental of housing. To further this objective, the Act makes it unlawful to "interfere" with someone who has "aided or encouraged" racial minorities to enjoy their statutory "right" to housing.  *See* 42 U.S.C. § 3617.

2.      Data from the 2000 Census regarding race and income show that, in the City of West Columbia, South Carolina, there is an insufficient stock of low-income rental housing within the economic means of African Americans and blacks.  Plaintiff, Connelly Development, LLC ("Connelly"), through its President, Kevin Connelly, planned to develop a low-income rental project known as "Tanners Crossing."  The project itself once built would be owned by Tanners Crossing, LP.  (Hereinafter, the plaintiff "Tanners Crossing" is referred to as "Tanners Crossing, LP" and the Tanners Crossing project is simply called "Tanners Crossing" or "the project.")  If the project were built, it would have increased that segment of West Columbia's housing affordable to the City's minority population, decreased community segregation, and promoted interracial association.  Connelly designed Tanners Crossing so its units could be rented to tenants earning at or below 60% of the 2004 Area Median Income for the Columbia Metropolitan Statistical Area, as determined by the U.S. Department of Housing and Urban Development ("US-HUD").  Census data show that 77.5% of African American or black households in West Columbia occupy rental housing.  *See infra* ¶ 64.

3.      Connelly would have successfully navigated all land use, zoning, and financing avenues to develop Tanners Crossing, but the Defendant withheld one last but vital approval: sewer service for the project.  The sewer lines already existed, no costly extension of new lines was necessary, and there was more than sufficient capacity within the current infrastructure to accommodate Tanners Crossing. Yet the City did not approve sewer hook-up for the project. Lacking that final sewer approval, Tanners Crossing LP became ineligible for low-income housing tax credits ("LIHTCs") from the South Carolina State Housing Finance and Development Authority ("SHFDA" or the "Authority").  Connelly and Tanners Crossing LP needed an allocation of LIHTCs to make the development of Tanners Crossing financially

2

practicable.

4.     Had the City approved the sewer hook-up, Tanners Crossing would have been allocated low-income housing tax credits under the Authority's 2004 Qualified Allocation Plan. Without an award of those 2004 tax credit incentives, Tanners Crossing became an economically infeasible venture for Connelly and Tanners Crossing, LP.

5.     After the 2004 LIHTC season came to a close and Connelly lost the opportunity for a tax credit allocation, the City *itself* annexed the Tanners Crossing site within its jurisdiction. Following that annexation, the City placed a restrictive zoning classification on the site to block Connelly, or anyone else, from building a multi-family project there.

6.     Minorities, who already suffer from a dearth of housing in West Columbia and who would have afforded the rents at Tanners Crossing, were thus deprived decent, affordable homes because the City interfered with the project's development, as well as the benefits of interracial association.

7.     Tanners Crossing LP, Connelly Development, the trade association of which Kevin Connelly is a member, the National Association of Home Builders, and Janice Davis, an African-American resident of West Columbia, South Carolina, hereby seek declaratory relief and a finding that West Columbia's interference with the development of Tanners Crossing is a discriminatory practice that violated the FHA.  42 U.S.C. § 3613(c)(1).  Connelly, Tanners Crossing LP, and Janice Davis further seek monetary damages pursuant to the FHA, including actual and punitive damages.  Connelly, Tanners Crossing LP, NAHB and Janice Davis also seek an award of reasonable attorneys' fees and costs, and any other relief that this Court deems just and proper.

## II.

## JURISDICTION AND VENUE

8.     The FHA allows an "aggrieved person" to commence a civil action in an appropriate United States district court to obtain relief from a discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A).  This court also has jurisdiction because Plaintiffs' claims arise under the laws of the United States.  28 U.S.C. § 1331.  The declaratory relief requested by Plaintiffs is authorized by 28 U.S.C. §§ 2201-2202.

9.     Venue is proper because all of the subject events, omissions, or violations of law occurred in this District, and because the Defendant performs its official duties in this District. 28 U.S.C. § 1391(e).

## III.

## PARTIES

### Plaintiffs

10.     Plaintiff Connelly Development, LLC ("Connelly"), is a limited liability corporation duly organized under the laws of the State of South Carolina.  Connelly is organized for the purpose of land development activities and has been involved in the development of numerous apartment communities throughout North and South Carolina, including projects incentivized with low-income housing tax credits.

11.     Plaintiff, Tanners Crossing, LP, is a Limited Partnership organized and operating under the law of the State of South Carolina for the express purpose of owning the development to be known as "Tanners Crossing."

12.     Tanners Crossing LP held an option to purchase 7.6 acres of real property which was in the jurisdiction of Lexington County, but the property was annexed by Defendant City of

4

West Columbia while Tanners Crossing LP still held the option. Connelly and Tanners Crossing LP intended to develop a low-income housing development, called Tanners Crossing, on the property. To effectuate that project, Connelly and Tanners Crossing LP sought, but never received, an award of tax credits from the South Carolina State Housing Finance and Development Authority.

13.    As the developer on the Tanners Crossing project, Connelly acted as the agent for Tanners Crossing LP by advancing funds and providing the manpower and expertise necessary for Tanners Crossing to be developed, including the design of the project, the preparation of submittals and applications necessary for governmental approvals and benefits. Specifically, Connelly advanced sums to Tanners Crossing for certain development matters as addressed *infra*, and Connelly acted for Tanners Crossing LP in its application for LIHTCs. For these efforts, and for its efforts during the remainder of the project until construction was completed, Connelly would be paid a "developer's fee" from Tanners Crossing LP.

14.    Plaintiff, Janice Davis, is an African-American head of the household working and residing in West Columbia, South Carolina. She rents her residence, but it is unsuitable for her needs. She has looked but has been unable to locate suitable affordable housing in West Columbia which would meet the housing needs of herself and her children. She desires to rent and live in affordable housing in West Columbia and would have liked to have lived in Tanners Crossing had it been built.

15.    Kevin Connelly, the President of Connelly Development LLC and the Managing Partner of Tanners Crossing, LLP, the General Partner that runs Tanners Crossing, LP, is a member of Plaintiff National Association of Home Builders ("NAHB").

16.    NAHB is a non-profit corporation incorporated in the State of Nevada with

headquarters in Washington, D.C.  It is a national trade association consisting of more than 220,000 builder and associate members organized into approximately 850 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico.  NAHB's members include individuals and firms that construct single- and multi-family homes, apartments, condominiums, and commercial and industrial projects, as well as land developers and remodelers.  The overwhelming majority of NAHB's members are small businesses.

(a.)    NAHB is the voice of the housing industry in the United States.  A great majority of the 1.9 million homes in the Nation started in 2004 were built by NAHB's members, and its members will construct about 80% of the more than 1.84 million new housing units projected for 2005.   Through its advocacy function on behalf of the Nation's home builders, NAHB represents its members in legal, regulatory, and legislative matters affecting the use and development of their property.  It is germane to NAHB's organizational purpose to ensure that its members can build and supply affordable housing for all people throughout the United States, regardless of race, nationality, or wealth, consistent with the standards used by the United States Department of Housing and Urban Development ("US-HUD")  that a household should pay no more than 30% of its annual income on housing.  *See* "Homes and Communities," Community Planning and Development, US-HUD, www.hud.gov/offices/cpd/affordablehousing/index.cfm (Last visited 2/14/05.)   The preamble to the Housing Act of 1949 enshrines NAHB's guiding principle to provide "[a] decent home and a suitable living environment for every American family."  To this end, NAHB's public affairs area disseminates its message regarding affordable housing through media events, press releases and publications.

(b.)    Independent of this litigation, NAHB has expended significant resources to ensure that its members (and the government agencies who regulate them) fully understand the

goals and requirements of the FHA, including the types of discriminatory housing practices that Congress prohibited in the Act. In this regard, NAHB has devoted staff and monetary resources to conduct legal research under the FHA, including research that specifically addresses the housing rights of minorities; sponsor educational programs to assist its members with FHA compliance; meet with lenders on the secondary mortgage market, such as Fannie Mae and Freddie Mac, to address the lack of affordable housing for minorities and develop strategies to increase minority homeownership; write comments on behalf of itself and its affiliate members, to ensure that land use and zoning decisions made by government agencies do not result in discriminatory housing practices prohibited by the FHA; and prepare and distribute publications, for the media and the public at large, regarding the need to ensure affordable housing for the American workforce.

(c.)    NAHB is a partner in a Bush Administration initiative, the White House Conference on Minority Homeownership's "Blueprint for the American Dream," (the "Blueprint Initiative"). The Blueprint Initiative is a public/private partnership—including US-HUD, other federal agencies, the Federal Home Loan Banks, mortgage groups, Habitat for Humanity, private companies, and trade associations—who have collectively committed to increase minority homeownership in the United States by 5.5 million households, by 2010. As its part in the Blueprint Initiative, NAHB has pledged to conduct a series of seminars to educate government officials, planners, community activists, consumers, and representatives of the housing industry on overcoming the barriers to minority homeownership, such as addressing the availability of capital and financing for minority families. A copy of the report describing the partners, goals and objectives of the Blueprint Initiative is available at http://www.hud.gov/initiatives/blueprint/index.cfm (last visited 2/14/05). NAHB's affiliate in

South Carolina, the Home Builders Association of South Carolina, is a partner of South Carolina Partners in Homeownership ("South Carolina Partners"), and has committed to the White House's Blueprint Initiative by seeking to expand homeownership opportunities for minorities in South Carolina. Information on the efforts of the South Carolina Partners can be found at http://www.hud.gov/local/sc/news/blueprint.cfm (last visited 2/14/05). Members of the South Carolina Home Builders Association are also members of NAHB.

(d.)    NAHB advocates for government programs that encourage its members to develop and build low-income housing. NAHB's leadership and staff frequently meet with officials from Congress and various federal agencies (such as the Federal Reserve, the Department of the Treasury, and US-HUD), to ensure the widespread availability of financial incentive programs for the construction of low-income residential projects. Specifically, NAHB has adopted policy that is directed to enhance the Low-Income Housing Tax Credit Program ("LIHTC") at issue in this case, to sustain and improve the program's effectiveness in supporting the production of affordable rental housing.

(e.)    The City's actions as described herein have required and will require NAHB to expend additional resources to monitor, investigate, address and/or counteract the City's unlawful conduct.

**Defendant**

17.    Upon information and belief, Defendant City of West Columbia ("West Columbia" or the "City"), is a municipality duly incorporated by the South Carolina Secretary of State, or alternatively, established by act of the South Carolina General Assembly. Upon information and belief, West Columbia is governed by its Mayor and West Columbia City Council.

18.    Defendant City of West Columbia owns, operates and controls the City of West Columbia Water and Sewer Utility (the "Utility") as a municipal sewer system.  The Utility is not a separate legal entity from the City.  Upon information and belief, The Utility's Director is an employee of the City.

## IV.

## FACTS

### A.  Tanners Crossing

19.    In December of 2003, Plaintiff Tanners Crossing, LP acquired rights to an option contract executed with an owner of real property to purchase 7.6 acres of land located adjacent to Hook Avenue.  At the time Tanners Crossing, LP acquired the option, the property was located in Lexington County, just outside the corporate boundaries of Defendant City of West Columbia. Upon execution of the option contract, Connelly as agent for Tanners Crossing LP placed $5,000 of Connelly's funds in escrow toward ultimate purchase of the property.

20.    Tanners Crossing LP intended to purchase the property to develop a multi-family, low-income rental housing project, known as "Tanners Crossing."  To that end, Connelly as agent for Tanners Crossing LP paid $14,000  as a preliminary fee for architectural services related to project design.  Tanners Crossing was initially designed as a 70-unit development of two- or three-bedroom townhomes, including a community center with computer facilities and Internet access for use after school by children living there.  Programs for crime watch and safety, quarterly social events, and a homeowners' association, were all planned amenities for the Tanners Crossing community.

21.    As Connelly and Tanners Crossing LP originally proposed, all of the 70 units in Tanners Crossing would have been reserved for low-income tenants.  (Later on, when it became

9

apparent that Connelly and Tanners Crossing LP could not build Tanners Crossing with the City's approval, the number of units with low-income rents was lowered to 50 to satisfy Lexington County's standards. *See infra* ¶¶35, 44.)

(a.)     Initially, rents at 35 of the units would have been offered at 50% of the Area Median Income (AMI) for the Columbia Metropolitan Statistical Area, as determined by US-HUD.   Rents at the other 35 units would have been offered at 60% of the AMI.  Based on Tanners Crossing's initial plan, the average rent for all of the units would have been $543 per month. The rents at Tanners Crossing were geared to annual household incomes that ranged from $20,091 at the bottom end (the minimum income necessary to afford a two-bedroom unit with rents at 50% of AMI), to $37,800 at the top end (the maximum income to qualify for a three-bedroom unit with rent at 60% of AMI).  However, a potential tenant could have income below $20,091 and still be eligible to rent at Tanners Crossing.

(b.)     Thus, the only persons, black or white, who would be eligible to rent at Tanners Crossing would have an annual household income of no more than $37,800 per year ("the Eligible Tenants.")

(c.)     Plaintiff Janice Davis would have been in 2004 and now is an Eligible Tenant.

### B. The Low Income Housing Tax Credit Program

22.     A project to construct low-income housing, without some form of government incentive, is generally an unprofitable venture.  However, the State of South Carolina administers a federal program that provides tax credits to land owners and developers who are willing to construct low-income housing.

23.     Specifically, in 1986 Congress created the Low-Income Housing Tax Credit ("LIHTC") program to promote the development of affordable housing for individuals and families of lesser economic means.

24.     Some affordable housing programs provide incentives in the form of direct subsidies to developers, homeowners, and/or renters.  LIHTCs, however, encourage investment of private capital by providing a dollar-for-dollar tax credit to offset an investor's federal income tax liability.

(a.)     The recipient of LIHTCs uses those tax credits to buy-down a mortgage or other development cost, so homes can be offered at below-market rents.  The amount of tax credit received is based on a formula that considers the costs of the development and the number of qualified low-income units for a given project.  Under the LIHTC program, state and local housing agencies allocate the state's credit "ceiling" among low-income housing projects whose builders and developers apply for credit.  The tax credits are received each year for ten years, and the taxpayer claims the credit on its federal income tax return every year over the course of the ensuing decade, on an equal *pro rata* basis.

(b.)     LIHTCs can be sold on the open market.  Frequently, a syndicator purchases tax credits from several development projects, manages them as part of a fund, and sells-off interests to investors.  Through this regime, LIHTCs provide the private development community with incentives to construct affordable housing by reducing costs related to mortgage payments, land acquisition, project construction, or substantial site rehabilitation.

25.     The amount of tax credit allocated to a state is determined by population; each state receives $1.75 per resident.  *See* Internal Revenue Code § 42(h)(3)(C).   In 2004, South Carolina received several million dollars in LIHTCs.

26.     In South Carolina, the State Housing Finance and Development Authority ("SHFDA" or the "Authority") is responsible for administering the LIHTC program.   On December 16, 2003, Governor Mark Sanford signed SHFDA's 2004 Qualified Allocation Plan ("2004 QAP"), which provided the governing standards, criteria and procedures by which SHFDA would evaluate housing projects and determine their eligibility for LIHTC awards in the 2004 season.

27.     The 2004 QAP recognized that Internal Revenue Code Section 42(m) required allocation of tax credits based on a preference for projects that: (1) serve the lowest income tenants; (2) serve qualified tenants for the longest periods; (3) contribute to a concerted community revitalization development plan; (4) are intended for eventual tenant ownership; (5) are intended to serve individuals with children; and (6) give preference to those on public housing waiting lists.  The 2004 QAP further allocated up to $600,000 in annual tax credits to each project located within an "urbanizing area," such as Lexington County.

28.     Moreover, applicants whose projects are within a Qualified Census Tract ("QCT"), as designated by US-HUD under Internal Revenue Code § 42(d)(5)(C), could receive a "basis boost" and amplify their chances to receive tax credits.  A QCT is any census tract, within a larger metropolitan statistical area, in which at least half of the households have income less than 60% of Area Median Gross Income.  The site for Tanners Crossing falls in Census Tract 0205.05 within the Columbia Metropolitan Statistical Area, which has received QCT designation by US-HUD.

### C.  Connelly's Efforts to Obtain LIHTCs for Tanners Crossing

29.      Kevin Connelly, as President of Plaintiff Connelly Development, LLC and as an agent of other development entities and the developments themselves (such as Tanners Crossing

LP), has a proven track record in obtaining LIHTC allocations from SHFDA. For example, Mr. Connelly through his companies has managed the LIHTC process, and has received tax credit awards, for the following low-income rental housing projects throughout South Carolina:

- Autumn Run Apartments, Darlington (40 units)
- Edgewood Apartments, Orangeburg (72 units)
- Hickory Hollow Apartments, Sumter (64 units)
- Wellington Square, York (50 units)
- Ashton Trace, Manning (32 units)
- Hickory Knoll Apartments, Georgetown (50 units)
- Hampton Chase Apartments, Orangeburg (64 units)
- Abbington Place, Lexington (12 units)
- Berkshire Place, Greer (50 units)
- Georgetown Commons, Georgetown (42 units)

30.     With experience from past successes, Connelly sought LIHTCs for Tanners Crossing LP. Without the LIHTCs, Tanners Crossing was not an economically feasible project. As the 2004 QAP explained, SHFDA established a two-tiered "competitive review" process whereby projects that desired tax credits were ranked based on a point system. Points were awarded (or subtracted) based on a project's satisfaction (or failure) of certain criteria. On February 24, 2004, Connelly for Tanners Crossing LP submitted a Tier 1 application, along with a non-refundable $500 application fee. In a letter dated April 28, 2004, SHFDA informed Connelly for Tanners Crossing LP that Tanners Crossing received a maximum 20 out of 20 points in the Tier 1 review. SHFDA thus invited Tanners Crossing LP to proceed to Tier 2 in the LIHTC award process.

31.     Before submitting a Tier 2 application, the 2004 QAP required applicants to pay for a market study of their projects, conducted by an independent, third-party analyst under

contract with SHFDA.  Connelly/Tanners Crossing LP thus paid a non-refundable $4,000 fee for a "Market Feasibility Analysis" for Tanners Crossing ("Market Study").  The Market Study concluded that "[t]he proposed units at Tanners Crossing will be well received in the market area among family renter households."  Among the Market Study's findings:

- "The site for the proposed Tanners Crossing Apartments is appropriate for the use proposed."

- "Adjacent land uses are compatible to the use proposed."

- "The site is located in close proximity to community amenities including police and fire protection, retail, employment centers, traffic arteries, and public parks."

- "There are no apparent physical disadvantages to the site."

- "The proposed tax credit rents and rents per square foot at Tanners Crossing are lower than the average existing properties for the 50 percent and 60 percent units.  The units at Tanners Crossing will have a competitive advantage over [other nearby, surveyed rental communities] based [on] these lower rents…."

- "The proposed LIHTC rents are considered to be achievable within the primary market area.  These rents are well below the maximum allowable LIHTC rents."

- "The proposed unit mix will appeal to a wide range of renter households….The unit mix is fairly evenly distributed among these AMI levels, resulting in valid and accurate capture rates."

- "...Tanners Crossing is expected to lease its units at a minimum rate of 7 units per month.  At this rate, Tanners Crossing will achieve 95 percent occupancy within 9 to 10 months."

- "Tanners Crossing will be positioned in the lower half of the range of net rents in the primary market area.  While offering low rents, the units themselves will be competitive, as they will be accompanied by new construction, large unit sizes, and adequate amenities.  The new construction will be particularly appealing, given the age and condition of the existing rent stock."

Through a letter to SHFDA dated March 25, 2004, Connelly/Tanners Crossing LP accepted the Market Study and recommended no alterations to its findings.

32.    With Tier 1 and the favorable Market Study completed, Connelly/Tanners

14

Crossing LP advanced to Tier 2 review.  Connelly/Tanners Crossing LP submitted Tanners Crossing LP's Tier 2 application on May 24, 2004, along with another non-refundable fee of $3,000.  As in Tier 1, SHFDA's Tier 2 review ranked projects based on a point system.  Tanners Crossing LP's Tier 2 application also claimed credit for a "boost" because Tanners Crossing is within a Qualified Census Tract as designated by US-HUD. *See supra* ¶ 28.

33.     Of particular concern here, a Tier 2 applicant needed to show that water and sewer services could be provided to the project site.  The 2004 QAP stated that water and sewer capacity:

> [S]hould only be contingent upon extension of an already existing line or addition of a lift station[s].  The availability and certification of the capacity of public water and sewer adequate to serve the site must be documented by letter(s)...from the local public water and sewer authorities....*[Such letters] must be submitted as part of the Tier Two application in order to claim points* and cannot be altered in any way.

QAP ¶ IV.B.1 (emphasis supplied).  Ten points would be awarded to projects that showed sufficient water and sewer availability for the project.  But without a water and sewer letter from the pertinent local government authority, a project would be rendered <u>ineligible</u> for 2004 LIHTCs.

### D.  Connelly's Efforts to Obtain Local Development Approvals

34.     While Connelly/Tanners Crossing LP were navigating SHFDA's tax credit process, they were also pursuing land use, zoning and infrastructure approvals needed to develop Tanners Crossing.

● <u>Requests to Defendant West Columbia for Annexation and Re-Zoning</u>

35.     The site for Tanners Crossing was located in Lexington County, just outside West Columbia's border, along Hook Avenue near the intersection with Morningside Drive (the

"Hook Avenue Property" or the "Property").  Lexington County had zoned the Property to accommodate multi-family use, so Tanners Crossing was consistent with the zoning there. However, the County had adopted by ordinance stringent "Locational Standards for Assisted Housing" ("Locational Standards") for development of low-income projects.  The Locational Standards were promulgated in January 1995 as an amendment to the County's Fair Housing Resolution, and among other things require that projects provide sidewalk access to commercial development and public transportation.  The Locational Standards also cap the number of low-income units in a given development to a maximum 50 units.

36.     Because of the rigorous nature of the Locational Standards, and because Tanners Crossing initially contemplated 70 low-income units, Connelly/Tanners Crossing LP chose to attempt to annex the Property into the jurisdiction of Defendant City of West Columbia and seek the City's approval to develop the project.  Any annexation into West Columbia would have resulted in a default zoning to the most restrictive single-family residential use ("R-4"), so Connelly/Tanners Crossing LP also sought to re-zone the Hook Avenue Property to "R-1" for multi-family use.

37.     On March 29, 2004, the City's Planning Commission unanimously recommended to annex the Hook Avenue Property with the proposed "R-1" zoning.

38.     Following the Planning Commission's unanimous recommendation for annexation and re-zoning, on April 13, 2004, Connelly/Tanners Crossing LP appeared before the West Columbia City Council.  The Council unanimously passed a motion for first reading of the annexation proposal.  However, the Council did not approve the request to re-zone the Property to allow multi-family uses.  Minutes from the April 13 meeting show that Council Members raised concerns about crime, security and the economic status of would-be renters at Tanners

16

Crossing. The City Council decided to table Connelly/Tanners Crossing LP's request for re-zoning until its next meeting. The meeting minutes reflect that several City officials favored postponing the re-zoning request to enable them to visit a LIHTC community that Connelly developed in West Orangeburg, South Carolina, known as "Hampton Chase," that was similar in design and financing to Tanners Crossing.

39.    On April 28, 2004, Mr. Connelly accompanied two City Council Members and the West Columbia's City Administrator for a tour of the Hampton Chase community in West Orangeburg. The West Columbia officials made no negative comments about Hampton Chase during the site visit, nor did they give any indication that re-zoning would be denied for Tanners Crossing.

40.    At its May 4, 2004 meeting, the City Council re-considered Connelly/Tanners Crossing LP's re-zoning request for the Tanners Crossing site. According to the meeting minutes, the Mayor noted the site visit he made to the Hampton Chase community. The meeting minutes reflect the Mayor's comment that Hampton Chase was "nicely developed," but he stated it was in an area with other apartment complexes while the Tanners Crossing site "was in the middle of an area with single family residences and a big density rental project was not really compatible to the area." This is the only articulated reason for denial of the re-zoning request reflected in the May 4, 2004 meeting minutes. The West Columbia City Council then unanimously denied Connelly/Tanners Crossing LP's re-zoning request to accommodate multi-family development.

41.    However, immediately adjacent to the Tanners Crossing site, at the intersection of Klapman Road and Hook Avenue, is an *industrial use* property. Furthermore, across the street from the Tanners Crossing site at the northwest corner of the site is the Jenni-Lynn Assisted

Living Community at 915 Hook Avenue, a *multi-unit elder care facility*.

42.     Connelly/Tanners Crossing LP requested a de-briefing with City officials to gain a better understanding as to why they denied re-zoning.  On May 13, 2004, a representative of the City stated in a meeting that the City opposed Tanners Crossing based on fears that a multi-family low income project would attract "undesirables."   From the context of the discussion, Connelly/Tanners Crossing LP's representatives attending the meeting understood that comment to mean the development would attract low-income minority tenants.

- **Connelly/Tanners Crossing LP Seeks and Receives Approvals from Lexington Co.**

43.     After realizing that Tanners Crossing could not be successfully developed in the City of West Columbia, Connelly/Tanners Crossing LP committed time and resources to satisfy all of Lexington County's zoning requirements, and timely submitted its Tier 2 application with SHFDA.

44.     In order to meet Locational Standards that were part of Lexington County's zoning requirements, Connelly/Tanners Crossing took several measures, including reducing the proposed size of the Tanners Crossing development, to insure that Tanners Crossing would meet these Locational Standards.

45.     In particular, Connelly/Tanners Crossing LP obtained a permit from the South Carolina Department of Transportation which would have allowed Connelly/Tanners Crossing LP to build a sidewalk from the Tanners Crossing site to a bus stop, which was necessary to satisfy Lexington County's Locational Standards.   After Connelly/Tanners Crossing LP presented this permit and related engineering information to Lexington County, Lexington County through a letter dated May 28, 2004 informed SHFDA that Tanners Crossing was an "allowed activity" with respect to the County's zoning maps, and thus it certified that based upon

this information as provided, the Tanners Crossing project would have met the Locational Standards.

46.     Although Connelly/Tanners Crossing LP would have had to eventually obtain construction plan approval, building permits, and other approvals normally obtained from local and governmental authorities before construction actually could begin on Tanners Crossing, such approvals were not required nor obtained as a general rule by any developer applying for LIHTCs at this preliminary stage of development.  Thus, Connelly/Tanners Crossing LP has performed all steps necessary at this stage of the LIHTC application process for an approval from Lexington County to go forward with the request for LIHTCs.

47.     After Defendant West Columbia denied Connelly/Tanners Crossing LP's re-zoning request, and after Connelly/Tanners Crossing LP received all necessary zoning approvals from Lexington County for purposes of the receipt of LIHTCs, on May 24, 2004, Connelly for Tanners Crossing LP submitted its Tier 2 application to SHFDA as the next step in the LIHTC allocation process.  (Additional information was submitted to SHFDA as part of this Tier 2 application as well, *see* ¶46 *supra*.)  However, to qualify for a 2004 tax credit allocation, Tanners Crossing LP needed one final approval—a letter certifying that water and sewer services would be made available to Tanners Crossing.  *See supra* ¶33.  And Tanners Crossing LP needed to obtain that letter from the City of West Columbia.

- **West Columbia Declines to Issue Sewer Service Letter**

48.     Although the Hook Avenue Property was within the political boundaries of Lexington County, it is in the service area of the West Columbia Water and Sewer Utility (the "Utility").  Accordingly, any certification to SHFDA regarding water and sewer service to Tanners Crossing, a prerequisite for the 2004 LIHTC process, would have to come from the

Utility.

49.     The Utility is a designated "public management agency" for purposes of implementing a water quality management plan under Section 208 of the Federal Water Pollution Control Act, 33 U.S.C. § 1288.  The water quality plan applicable to the Hook Avenue Property has been developed by the Midlands Council of Governments ("COG") and is entitled, "208 Water Quality Management Plan, Central Midlands Region, Adopted March 25, 2004" ("COG Water Quality Plan").  The Utility is bound to provide or deny water and sewer service based on the requirements set forth in the COG Water Quality Plan.

(a.)     The COG Water Quality Plan requires the Utility to provide wastewater service to areas where "wastewater service exists," *i.e.*, it is unnecessary to build new infrastructure or extend the termini of existing lines.  Both SHFDA and the South Carolina Department of Health and Environmental Control determine sewer availability as the location of a line within 300 feet of a property's boundary.  An existing sewer line is located within 125 feet of the Hook Avenue Property.  Accordingly, sewer service was available to Tanners Crossing and should have been provided by the Utility, as prescribed by the COG Water Quality Plan.

(b.)     On May 7, 2004, Connelly/Tanners Crossing LP requested that the City provide SHFDA with a letter evincing a commitment of water and sewer service to the Hook Avenue Property.  Upon information and belief, such commitment letters were normally issued by the City within approximately thirty days from the time of a request.  However, on May 18, 2004, the City's Utility's Director stated that he was instructed not to assist in providing a water/sewer letter for Tanners Crossing.  Connelly/Tanners Crossing LP thereafter repeatedly communicated with West Columbia officials seeking a water/sewer commitment letter, to no avail.

50.     Connelly/Tanners Crossing LP then learned that the City Council would hear and consider the request for a water/sewer letter at its June 1, 2004 meeting.  Upon information and belief, it was not the City's normal practice to consider requests for water/sewer letters through City Council meetings.  Mr. Connelly thus returned to the City Council and presented remarks at that meeting.  The City stated that its engineer had questioned whether the Utility had the capacity to receive wastewater flows from Tanners Crossing.  This was the first time that matters of sewer capacity were raised to Connelly/Tanners Crossing LP with regard to the development of Tanners Crossing.  The Council did not discuss the matter further at the June 1 meeting, and it took no action on Plaintiff's request for a water/sewer commitment letter.  (At the same meeting, the City Council gave second reading to an ordinance expanding the City's boundaries by annexing *another* proposed multi-family development, unrelated to Connelly or Tanners Crossing.)

51.     Upon information and belief, the City of West Columbia's Sewer Utility is a collection system only, and the Utility contracts with the Columbia Metro Wastewater Treatment plant ("Metro") to provide treatment and disposal services.  Upon information and belief, the City of West Columbia has contracted with Metro for approximately 3.2 million gallons per day ("mgd") in wastewater flows.  Metro has a permitted capacity of 60 mgd per day and a current committed capacity of 30 mgd per day; thus, Metro has 30 mgd per day of unused sewage and treatment disposal capacity.  The City of West Columbia's average flows, or its contribution to Metro's plant, are less than 3 mgd per day.  Wastewater flows generated by Tanners Crossing would be less than 28,000 gallons per day.

52.     Ultimately, the City stated that it believed a hook-up for Tanners Crossing might exceed the City's daily flow capacity for sewage.  In particular, the City claimed it had approved

a number of projects prior to the proposal for Tanners Crossing that were to feed into what is known as the "Contract K" sewage line, and the City claimed that it did not know if the Contract K line could handle the capacity of these other previously-approved projects.

      (a.)    The prior approved projects (collectively, the "Prior Projects") included the Quailridge Subdivision, with expected gallons of flow per day ("gpd") of 24,000; the Quailridge Garden Homes with 35,200 gpd; the Gates of Quail Hollow with 17,200 gpd; Saluda Commons with 16,800 gpd; the Quail Creek Subdivision with 11,200 gpd; and the Lexington Medical Center, an 11-story complex which did not even have a gpd determination. Upon information and belief, the City did not raise a water or sewer capacity concern with any of the Prior Projects.

      (b.)    However, unlike Tanners Crossing, none of the Prior Projects would have provided low or moderate income housing. Upon information and belief, approval of the Prior Projects raised the same issues of capacity for the Contract K line that concerned the City with regard to Tanners Crossing, yet all of the Prior Projects were granted sewer hook-up. In any event, even if the Contract K line did not have capacity to accommodate all of the Prior Projects and Tanners Crossing, the City had an obligation as a Section 208 "public management agency" to implement the COG Water Quality Plan to provide sewer capacity for such anticipated growth. *See supra* ¶49a.

      (c.)    Upon information and belief, jurisdictions in the greater Columbia area other than West Columbia that are served by the same Contract K line have not instituted moratoriums on development or otherwise limited development because of so called "capacity issues."

      (d.)    Thus, the City's use of the "sewer capacity" issue was a pretextual defense

utilized by the City in order to delay providing a sewer letter until either it was too late for Connelly/Tanners Crossing LP to receive LIHTCs under the 2004 QAP, or the City annexed the Tanners Crossing site with zoning to exclude multifamily housing, *see* ¶¶54-60, *infra*.

53.     Frustrated by the City's refusal to provide the water/sewer letter, on June 9, 2004, Connelly filed a lawsuit in the Lexington County Court of Common Pleas, encaptioned *Connelly Development, LLC v. City of West Columbia, et al.*, Civil Action No. 2004-CP-32-2143 ("the State Lawsuit"). Connelly's objective was to receive an allocation of LIHTCs for the 2004 season, so the State Lawsuit sought an injunction to compel the City to issue a water/sewer letter for Tanners Crossing, and to prohibit the City from annexing the Hook Avenue Property with a zoning classification that would preclude the projects' development.

54.     After Connelly filed the State Lawsuit, in a letter dated June 14, 2004, the Utility certified to SHFDA that *water* service could be provided to Tanners Crossing. Insofar as *sewer* service was concerned, the Utility acknowledged that a sewer line is within 300 feet of the site boundary. However, the letter stated that the Utility "[was] not currently able to certify that this property meets the other requirements...for sewage service." In the June 14 letter, the Utility never explained exactly what "other requirements" were unsatisfied, but that it was "in the process of reviewing the matter and will supplement our responses as soon as possible." Upon information and belief, that was the last and only letter the Utility provided to SHFDA about sewer service for Tanners Crossing.

### E.  SHFDA to Connelly: "No Utility Letter, No Tax Credits"

55.     The next day, June 15, 2004, SHFDA notified Connelly/Tanners Crossing LP that Tanners Crossing LP's Tier 2 application was incomplete because it failed to indicate that water and sewer service were available for Tanners Crossing. SHFDA warned that Tanners Crossing

LP had until 5:00 p.m. on June 25, 2004, to provide certification of available water and sewer service for Tanners Crossing.

56.     Meanwhile, Connelly decided that pursuing the State Lawsuit was a futile effort because it would not come to final resolution through an anticipated appeal by SHFDA's June 25, 2004 deadline for a water/sewer letter, and any court injunction issued after that date would be too late because eligibility for 2004 LIHTCs would have expired.  Accordingly, on June 16, 2004, Connelly voluntarily dismissed the State Lawsuit without prejudice.  The City had not yet filed an answer to the complaint in the State Lawsuit.

57.     On June 17, 2004, SHFDA again notified Connelly/Tanners Crossing LP of the looming June 25, 2004 deadline to receive a sewer commitment letter from the City.  In this June 17 letter, SHFDA stated it was satisfied that water service could be provided based on the City's June 14 letter (*see supra* ¶54), but that letter "[did] not demonstrate that the City has availability/capacity to provide sewage service" for Tanners Crossing.  SHFDA again warned Connelly/Tanners Crossing LP that "[f]ailure to provide this threshold requirement [of sewer service] shall disqualify [Tanners Crossing] for further consideration" in the 2004 LIHTC allocation process.

58.     With no sewer commitment letter from the City forthcoming, on June 18, 2004, Connelly/Tanners Crossing LP sent a final letter to SHFDA.  Connelly/Tanners Crossing LP asked SHFDA to consider the fact that the Utility was required to provide sewer service under the COG Water Quality Plan, because the Hook Avenue Property boundary was within 300 feet of an existing sewer line.  *See supra* ¶54.

59.     SHFDA did not respond in writing to Connelly/Tanners Crossing LP's June 18 letter.

60.     The City never issued a sewer commitment letter by SHFDA's June 25, 2004 close-of-business deadline.

61.     In the end, Tanners Crossing failed to receive an allocation of 2004 LIHTCs from SHFDA to develop Tanners Crossing.

62.     SHFDA informed Connelly/Tanners Crossing LP that, had the City provided a sewer commitment letter, 2004 LIHTCs would have been allocated to Tanners Crossing

## F.  The City *Itself* Annexes the Hook Avenue Property

63.     Shortly before the State Lawsuit was filed, the City announced its intention to annex the Hook Avenue Property—not the entire parcel, but only that portion where Tanners Crossing would be built.

(a.)     Although the City claimed that residents of Hook Avenue had sought annexation since 1997, the City did not begin annexation proceedings until it was aware that Connelly/Tanners Crossing LP was obtaining approvals from Lexington County to build Tanners Crossing.  By law the City, as one option for annexation, could obtain a petition showing that 75% of the residents in the area-to-be-annexed favored annexation.  Upon information and belief, in order to obtain that threshold 75% support of residents in the area to be annexed (which included the area where Tanner's Crossing was to be built), the City deliberately gerrymandered the boundaries of the annexation to obtain signatures from a restrictive pool of residents predisposed to support the annexation and oppose the development of Tanners Crossing.

(b.)     Consequently, after the State Lawsuit was dismissed, the City *itself* annexed the Hook Avenue Property.  As a result, all of the approvals that Connelly/Tanners Crossing LP obtained from Lexington County, to comply with the County's Locational Standards because the City refused to re-zone the property for multi-family use, became

25

irrelevant. Moreover, following the annexation, the City's zoning ordinance automatically classified the Hook Avenue Property under category **"R-4"**—the most restrictive single-family residential zoning possible.

(c.)    Upon information and belief, in the past the City has annexed property with, or suitable for, multi-family housing projects. However, in this case, the "R-4" default zoning that applied after the annexation precluded Connelly/Tanners Crossing LP, or anyone else, from developing a low-income multi-family project on the Hook Avenue Property. Upon information and belief, the City specifically annexed only that portion of the Property proposed to contain Tanners Crossing to permanently prevent Connelly/Tanners Crossing LP from developing that project.

## G.  Race and Income

64.    According to 2000 census data, 77% of African American or black households living in the City of West Columbia earn less than $35,000, compared to 50% of white households. Furthermore, 32.6% of African Americans or blacks in West Columbia have income below the poverty level, compared to only 11.6% of whites in the City. Additionally, in West Columbia, 77.5% of the African American or black households are renters, while 34.5% of the white households are renters. Accordingly, based on 2000 census data, the City of West Columbia's minority population is poorer and more likely to rent as an "Eligible Tenant", see *supra* at ¶21(b), as compared to its white population. Similar statistics from the 2000 census exist for the census tracts analyzed in the Market Study.

65.    When statistics from the 2000 census are tested in relation to the geographic areas encompassed by the Tanners Crossing Market Study (*supra*, ¶31), the data show that the Tanners Crossing project would have had a statistically significant greater impact upon African-American

or black Eligible Tenants (including Plaintiff Janice Davis) as compared to white Eligible Tenants. Therefore, a greater proportion of African-American or black renters would have been eligible to rent at Tanners Crossing than white renters. Thus, the Defendant's interference with the development of a low-income rental project like Tanners Crossing had a more burdensome effect on African American and black residents of West Columbia (which is included within the geographic areas encompassed by the Market Study) and on Plaintiff Janice Davis, compared to the same geographic area that includes the City's white population.

66.     In a geographic radius of (a) ¼ mile (total population 111); (b) ½ mile (total population 570); (c) 1 mile (total population 4,134); (d) 1.5 miles (total population 10,648); (e) 2 miles (total population 20,088); and (f) 2.5 miles (total population 30,417) of the proposed Tanners Crossing location, the population is in every case over seventy-five (75%) percent white and less than twenty (20%) percent African American. Further, upon information and belief, the properties annexed by the City of West Columbia as described *supra* at ¶63 are well over 75% white. Thus, Defendant's interference with the development of Tanners Crossing also perpetuated segregation in one or all of these areas by greatly reducing the likelihood that these majority white areas will be desegregated, thus preventing interracial association.

## V.
## CLAIM FOR RELIEF

### (Violations of the Fair Housing Act)

67.     The above stated paragraphs are realleged as if fully set forth herein.

68.     Section 804(a) of the Fair Housing Act ("FHA" or the "Act") provides that "it shall be unlawful…(t)o make available or deny…a dwelling to any person because of race, color…or national origin." 42 U.S.C. § 3604(a).

27

69.     To violate the FHA, it is *not* necessary for a government body to intentionally exclude minorities from housing opportunities, or to be motivated by racial *animus* in its land use and zoning decisions.  Pursuant to the Act, local government entities may not use their land use and zoning authority in a manner that has a discriminatory *effect* against minorities.

70.     There is a lack of affordable housing for African Americans and blacks living in the City of West Columbia.  If Tanners Crossing were built, rents for townhomes in the project would have been affordable to minorities protected by the FHA, based on statistics and demographics regarding race, income, and tenant status in the City of West Columbia.  Moreover, interference with the construction of Tanners Crossing had a greater effect in depriving low-income housing opportunities for African-American or black Eligible Tenants, such as but not limited to Plaintiff Janice Davis, as compared to white Eligible Tenants.  Additionally, if Tanners Crossing were built, the larger number of Eligible Tenants who would have been African American would have promoted interracial association in that geographic area.  Defendant's interference with the construction of Tanners Crossing had the effect of perpetuating segregation in that geographic area, thus preventing interracial association.

71.     Furthermore, the Act states it shall be unlawful to "interfere" with any person who has aided or encouraged "any other person in the exercise or enjoyment of…any right granted or protected by" Section 804.  42 U.S.C. § 3617.

72.     For Connelly/Tanners Crossing LP to build Tanners Crossing, Tanners Crossing LP needed to receive an allocation of LIHTCs from SHFDA to make the project economically feasible.  Tanners Crossing LP did not receive an LIHTC allocation because the Defendant refused to provide a letter committing the provision of sewer service to Tanners Crossing.

73.     In delaying and failing to issue a sewer commitment letter to SHFDA, Defendant

28

violated the FHA by interfering with Connelly/Tanners Crossing LP's efforts to build Tanners Crossing.

74.    There was no rational reason or otherwise legitimate government purpose justifying the City of West Columbia's failure to issue a letter to SHFDA evidencing commitment of sewer service to Tanners Crossing.  Alternatively, assuming *arguendo* that such a rational reason or legitimate government purpose existed, the City could have accomplished its goals (such as ensuring adequate sewer capacity) in a manner having a less discriminatory effect on African Americans and blacks in West Columbia, who were deprived housing opportunities to live at Tanners Crossing.

75.    Moreover, the City's refusal to re-zone the Hook Avenue Property to allow multi-family development, and then its annexation of the Property with a restrictive zoning classification to prevent higher density development, interfered with Connelly/Tanners Crossing LP's efforts to build Tanners Crossing and thereby violated the FHA.

76.    There was no rational reason or otherwise legitimate government purpose for the City to deny Connelly/Tanners Crossing LP's request to re-zone the Hook Avenue Property to accommodate Tanners Crossing.  Nor was there a rational reason or otherwise legitimate government purpose for the City to annex only a portion of the Property that would have contained Tanners Crossing, with a restrictive zoning to prevent higher density development. Alternatively, assuming *arguendo* that such a rational reason or legitimate government purpose existed (such as concerns regarding density or compatibility with surrounding development), the City could have accomplished its goals in a manner having a less discriminatory effect on African Americans and blacks in West Columbia, who were deprived housing opportunities to live at Tanners Crossing.

77.     Exercise of the option became infeasible because of defendant's interference with Connelly/Tanners Crossing LP's plans to build Tanners Crossing on the Property.  Plaintiff Tanners Crossing LP thus allowed the option on the Property to expire.

78.     The FHA violations committed by Defendant, as alleged in ¶¶34-63, entitle the Plaintiffs to the following relief:

(a.)     As to all Plaintiffs, a declaration pursuant to the Federal Declaratory Judgment Act, that the Defendant's failure to issue a letter committing the provision of sewer services to Tanners Crossing, its annexation and R-4 zoning of the Hook Avenue Property containing the Tanner's Crossing site, and/or its refusal to re-zone the Hook Avenue Property to accommodate multi-family uses, interfered with Connelly/Tanners Crossing LP's development of Tanners Crossing, interfered with the development of Tanners Crossing and had a discriminatory effect on the ability of minorities to obtain affordable housing in West Columbia, and perpetuated community segregation and prevented interracial association, thereby violating the Fair Housing Act, so that the annexation and/or the restrictive rezoning are invalid as against Connelly/Tanners Crossing LP;

(b.)     As to Connelly, its actual and punitive damages caused by the Defendant's violations of the Act, including but not limited to damages representing his its lost profits from its development fee on the Tanners Crossing project, its out of pocket expenses in seeking approvals for the Tanners Crossing project, and any other consequential or special damages allowed by law, including but not limited to pre-judgment interest;

(c.)     As to Tanners Crossing LP, its actual and punitive damages caused by the Defendant's violations of the Act, including but not limited to damages representing its loss of 2004 LIHTCs and/or its lost profits on the Tanners Crossing project, any out of pocket expenses

30

in seeking approvals for the Tanners Crossing project, and any other consequential or special damages allowed by law, including but not limited to pre-judgment interest;

(d.)     As to Plaintiff Janice Davis, her actual and punitive damages for the acts and omissions of Defendant above alleged in that she has been deprived of affordable housing that is modestly priced and affordable within West Columbia.

(e.)     As to all Plaintiffs, award their attorneys' fees and expenses as allowed by 42 U.S.C. § 3613(c)(2); and

(f.)     Any other such relief as the Court may find just under this claim.


Respectfully submitted,

McNAIR LAW FIRM, P.A.


By: s/Benjamin E. Nicholson, V
Benjamin E. Nicholson, V (Fed. ID#4958)
P.O. Box 11390
Columbia, South Carolina  29211
February 17, 2005                           P:  (803) 799-9800
Columbia, South Carolina              F:  (803) 753-3278
                                                    nnicholson@mcnair.net
*Of counsel:*

Mary Lynn Pickel, Esquire

National Association of Home Builders
1201 15th Street, NW
Washington, D.C.  20005
P: (202) 266-8200                           Attorneys for the Plaintiffs


31