UNITED STATES DISTRICT COURT FOR
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| **Connelly Development, LLC,** <br> 5530 Bush Road <br> Columbia, SC 29212-3007, | ) <br> ) <br> ) <br> ) | Civil Action No.: 3:05-460-MBS |
| **Tanners Crossing, LP**, <br> 5530 Bush River Road <br> Columbia, SC 29212-3007 | ) <br> ) <br> ) <br> ) | |
| **Janice Davis**, an individual residing in <br> West Columbia, South Carolina, | ) <br> ) <br> ) | **PLAINTIFFS'** <br> **COMBINED** |
| and | ) <br> ) | **MEMORANDUM** <br> **IN OPPOSITION TO DEFENDANT'S** |
| **National Association of Home Builders** <br> **of the United States,** <br> 1201 15th Street, NW <br> Washington, D.C. 20005, | ) <br> ) <br> ) <br> ) <br> ) | **MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | |
| **City of West Columbia,** | ) <br> ) | |
| Defendant. | ) <br> ) <br> ) | |

The Plaintiffs hereby submit their (combined) Memorandum in Opposition to the Motion

for Summary Judgment of the Defendant, City of West Columbia, as follows:

## FACTUAL BACKGROUND

**A.**     <u>**Summary**</u>

This lawsuit is about the plan of a real estate developer, Kevin Connelly, to build a low-to-moderate income housing project in the City of West Columbia, and the extreme lengths pursued by the City to prevent that plan's fruition. The City's pattern of interference with the development of the "Tanners Crossing" project started with a refusal to annex and rezone the property to allow multi-family development, advanced to a deliberate delay in authorizing water and sewer service so as to impede tax credit financing, proceeded with direct annexation of the property, and culminated in a restrictive zoning to prevent construction of Tanners Crossing (or any other multi-family project, for that matter.) These actions of West Columbia violated the federal Fair Housing Act ("FHA"), because they "interfered" with Connelly's efforts to make housing available to groups protected under the Act, had a discriminatory effect on minorities, or alternatively, were taken with intent to discriminate on the basis of race. See 42 U.S.C. §§ 3604(a), 3617.

This is the second time West Columbia has filed a Motion for Summary Judgment. West Columbia's first motion, filed December 1, 2005 (*see* Docket No. 36), primarily concerned Plaintiffs' standing. The first summary judgment motion also covered causation related to whether or not Connelly would have obtained financing and ultimately succeeded in building Tanners Crossing under Lexington County requirements. Judge Perry denied that motion on June 12, 2006 (*see* Docket No. 58), based on the arguments in Plaintiffs' Opposition Memoranda

PDF created with pdfFactory trial version www.pdffactory.com

(*see* Docket No. 43).[1]  With the City's present motion, the Court should respectfully do the same and deny it.  There are more than enough material facts in question to warrant a jury trial.

**B.    <u>Relevant Facts</u>[2]**

1.    <u>The Tanners Crossing Low-to-Moderate Income Housing Project.</u>

Kevin Connelly, the President of Connelly Development LLC, managed Tanners Crossing LP.  Tanners Crossing LP was formed for the purpose of owning the multi-family, low-to-moderate income housing project that would have been called "Tanners Crossing."[3] (Connelly Development, LLC and Tanners Crossing LP are collectively referenced as "Connelly.")

In 2003, Mr. Connelly became aware of two real estate tracts of approximately seven acres on Hook Avenue, then just outside the City of West Columbia, that were the perfect location for Tanners Crossing ("the Property").[4]  In December 2003, Connelly Development, as agent for Tanners Crossing LP, obtained an option to purchase the Property.[5]

A project to construct low-income housing, without some form of government incentive, is generally an unprofitable venture.[6]  However, the State of South Carolina administers the federal Low Income Housing Tax Credit ("Tax Credit") program to provide financial incentives that promote the development of affordable housing for individuals and families of lesser economic means.  The State Housing Finance and Development Authority ("SHFDA" or the

---

[1] At page 33 of its Memorandum in Support of its present Motion, Defendant apparently asks for reconsideration of the denial of its first summary judgment motion.  Plaintiffs prevailed on that prior motion, and Defendant offer no additional factual or legal argument that would merit reconsideration at this time.

[2] Some of the facts as cited in each subsection are found in the sworn Declaration of Kevin Connelly filed January 18, 2006, Docket No.  43, filed in opposition to West Columbia's first Motion to Dismiss/Summary Judgment, which Judge Perry denied.

[3] Connelly 1/18/06 Declaration, ¶¶2, 3.

[4] Connelly 1/18/06 Declaration, ¶3.

[5] Connelly 1/18/06 Declaration, ¶4.

[6] Connelly 1/18/06 Declaration, ¶11.

PDF created with pdfFactory trial version www.pdffactory.com

"Authority") administers Tax Credits in South Carolina.[7]  The Authority's 2004 Qualified Allocation Plan ("2004 QAP") provided the governing standards, criteria and procedures by which SHFDA would evaluate housing projects for Tax Credit eligibility.[8]

Each year, the Authority awards Tax Credits that enable developers to finance construction of low-to-moderate income housing, and then rent the units at below-market rates to qualifying households that are otherwise unable to afford housing.[9]  Thus, for example, based on income levels in the project's market area, rents at Tanners Crossing were geared to annual household incomes ranging from $20,091 to $37,800.[10]  However, a potential tenant could have income below $20,091 and still be eligible to rent at Tanners Crossing.[11]  Indeed, from a practical standpoint, many tenants in other such projects built by Connelly had incomes below their targeted minimal income levels.[12]  Due to these sub-market rents, Connelly development determined that Tanners Crossing would not be an economically feasible project unless it received Tax Credit financing.[13]

As the 2004 QAP explained, SHFDA established a two-tiered "competitive review" process, and Connelly's Tanners Crossing application received a maximum 20 out of 20 points in Tier 1 review.[14]  Before submitting a Tier 2 application, the 2004 QAP required an independent analyst to prepare a "Market Feasibility Analysis" for Tanners Crossing ("Market

---

[7] Connelly 1/18/06 Declaration, ¶11.
[8] Connelly 1/18/06 Declaration, ¶¶15, 16.
[9] Connelly 1/18/06 Declaration, ¶13.
[10] Connelly 1/18/06 Declaration, ¶10.
[11] *Id.*
[12] Teel Depo. 43:25-46:2; 53:13-54:25-25; 58:4-59:4; *see* Report at Ex. 1, pages 8-11. (See full depo. transcript and exhibits filed at this footnote.)
[13] Connelly 1/18/06 Declaration, ¶13.  Kevin Connelly's companies have a proven track record in receiving Tax Credits to develop many low-to-moderate income projects throughout South Carolina.  See Connelly 1/18/06 Declaration, ¶18.
[14] Connelly 1/18/06 Declaration, ¶20.

PDF created with pdfFactory trial version www.pdffactory.com

Study").[15]  An important feature of the QAP Market Study is that SHFDA—not Connelly—selected the company to perform the Market Study, in this case, Real Property Research Group and one of its principals, Ted Scepaniak.[16]  This insures the independence and reliability of the market analysis.[17]  Around 20-25% of such independent market studies find that a market for a Tax Credit project is unfavorable.[18]  In its QAP, SHFDA established some of the criteria to be analyzed in the Market Study for determining demand for a project.[19]  Thus, a Market Study that found a need for a Tax Credit development in a particular geographic region was based on the State's criteria in implementing federal tax credit allocations, to demonstrate the need for such housing in that market area.[20]

The Market Study for Tanners Crossing concluded that "[t]he proposed units at Tanners Crossing will be well received in the market area among family renter households."  Among the Market Study's findings were:[21]

- "The site for the proposed Tanners Crossing Apartments is appropriate for the use proposed."

- "Adjacent land uses are compatible to the use proposed."

- "The site is located in close proximity to community amenities including police and fire protection, retail, employment centers, traffic arteries, and public parks."

- "There are no apparent physical disadvantages to the site."

- "The proposed tax credit rents and rents per square foot at Tanners Crossing are lower than the average existing properties for the 50 percent and 60 percent units. The units at Tanners Crossing will have a competitive advantage over [other nearby, surveyed rental communities] based [on] these lower rents…."

---

[15] Connelly 1/18/06 Declaration, ¶21.
[16] Scepaniak Depo. 9:13-16; 22:3-24:2; 24:9-18. (See full depo. transcript and exhibits at this footnote.)
[17] Scepaniak Depo. 22:15-23:2. (See transcript filed at Fn. 16.)
[18] Scepaniak Depo. 115:21-116:10. (See transcript filed at Fn. 16.)
[19] Scepaniak Depo. 29:7-22; 32:9-23; Ex. 40. (See transcript filed at Fn. 16.)
[20] *Id*. (See transcript filed at Fn. 16.)
[21] Scepaniak Depo.30:23-33:8; Ex. 39, Market Study, pages iv-vi; (See transcript filed at Fn. 16.) Connelly 1/18/06 Declaration ¶21.

PDF created with pdfFactory trial version www.pdffactory.com

- "The proposed LIHTC rents are considered to be achievable within the primary market area. These rents are well below the maximum allowable LIHTC rents."

- "The proposed unit mix will appeal to a wide range of renter households….The unit mix is fairly evenly distributed among these AMI levels, resulting in valid and accurate capture rates."

- "...Tanners Crossing is expected to lease its units at a minimum rate of 7 units per month. At this rate, Tanners Crossing will achieve 95 percent occupancy within 9 to 10 months."

- "Tanners Crossing will be positioned in the lower half of the range of net rents in the primary market area. While offering low rents, the units themselves will be competitive, as they will be accompanied by new construction, large unit sizes, and adequate amenities. The new construction will be particularly appealing, given the age and condition of the existing rent stock."

With the favorable Market Study completed, SHFDA permitted Connelly Development to advance to Tier 2 review. Of particular relevance here is that a Tier 2 applicant needed to show that water and sewer services could be provided to the project site. The 2004 QAP stated:

> The availability and certification of the capacity of public water and sewer adequate to serve the site must be documented by letter(s)...from the local public water and sewer authorities....*[Such letters] must be submitted as part of the Tier Two application in order to claim points* and cannot be altered in any way.

QAP ¶ IV.B.1 (emphasis supplied)[22]. Without a water and sewer letter from the pertinent local government authority, a project would be rendered <u>ineligible</u> for 2004 Tax Credits.[23] Tanners Crossing could not be built without these Tax Credits.[24]

2.  <u>West Columbia's First Efforts to Interfere With the Project.</u>

Before West Columbia made its opposition known to Tanners Crossing, Connelly (through the property owner, Emily Baughman) sought to have the Property annexed into the

---

[22] Connelly 1/18/06 Declaration ¶24.
[23] *Id.*
[24] Connelly 1/18/06 Declaration ¶19.

PDF created with pdfFactory trial version www.pdffactory.com

City's jurisdiction along with a zoning to "R-1" to accommodate multi-family use.[25]   West Columbia's Comprehensive Plan, adopted by the City pursuant to South Carolina law, provided that the Property should be zoned to accommodate multi-family housing if annexed into the City in the future.[26]   Accordingly, based partially on the Comprehensive Plan, the City's zoning official recommended annexation of the Property with a zoning category to accommodate Tanners Crossing.   The City's Planning Commission followed suit, and unanimously recommended annexation of the Property with the proposed "R-1" zoning.[27]   Yet, during the Planning Commission meeting, Mr. Connelly was surprised that Planning Commission member Buchanan asked him if Tanners Crossing was meant to house "Bantus," a persecuted African tribe being relocated to the Columbia area.[28]   This was a hint of what was to come.

West Columbia's City Council still had to give its approval of annexation and zoning after the Planning Commission's recommendation.   At its April 13, 2004 meeting, the Council unanimously passed a motion for first reading of the annexation proposal, but it did <u>not</u> approve the request to re-zone the Property to allow multi-family use.[29]   Council members B.J. Unthank and Jack Harmon raised concerns about crime, security and the economic status of would-be renters at Tanners Crossing.[30]   Council Member Unthank stated that he wanted to view another similar Tax Credit project, and Kevin Connelly agreed to provide a tour of one that he developed in Orangeburg.[31]   Consequently, the Council tabled the zoning request at that meeting.   On April

---

[25] Connelly 1/18/06 Declaration ¶¶25, 26.
[26] For a more detailed discussion of South Carolina's comprehensive planning requirement, *see* Section III.D.1, *infra*.
[27] See Section III.D.1., *infra*.
[28] See Section III.B.2.f., *infra*.
[29] See McKinnon Depo. 155:25-156:7, Ex. 24 "Minutes of April 13, 2004 West Columbia City Council Meeting," Agenda Item IV, D. New Business, pages 7-9.
[30] *Id.*
[31] *Id.*

PDF created with pdfFactory trial version www.pdffactory.com

28, 2004, Council Members Unthank and Harley and Deputy City Administrator Myron Corley traveled to Orangeburg to view Connelly's Hampton Chase development.[32]

Unknown to Connelly, within days (if not hours) of the April 13, 2004 Council meeting, Unthank, Harmon and Corley started an annexation effort in the Hook Avenue area where the Property was located. Although previous annexations had occurred in that area, none included the Property.[33] Seizing upon neighborhood fears of "undesirables" and "gangs" occupying Tanners Crossing, these City officials compiled a petition of residents that would forcibly annex the Property within West Columbia's borders, with the intent of achieving an automatic restrictive zoning classification immediately after annexation that would prevent the Project's construction.[34] During the next month, even while Unthank and Corley were viewing the Orangeburg development with Connelly, they never disclosed their secret annexation plans to him.[35] These West Columbia officials went to extreme lengths to insure that the annexation petition was circulated quietly and quickly, to prevent Connelly from knowing about it so that he could not pull any construction permits from Lexington County. Indeed, Lexington County would have grandfathered Tanners Crossing as a multi-family project notwithstanding the restrictive zoning anticipated by West Columbia.[36]

At a May 4, 2004 meeting, the City Council, led by members Unthank and Harmon, refused to allow the rezoning, stating that the Property was in the middle of an area with single family residences and a higher density rental project was not compatible.[37] This was a pretextual

---

[32] *Id.*
[33] *Id.*
[34] *Id.* West Columbia's zoning ordinance provided that upon annexation of any new property into the City, the default zoning was the most restrictive, in this case, single family homes only. McKinnon Depo. 74:3-7. The clandestine lengths pursued by West Columbia officials to insure annexation of this Hook Avenue area are described in much more detail, *infra* at Section III.B.1.
[35] *Id.*
[36] *Id.*
[37] *Id.*

PDF created with pdfFactory trial version www.pdffactory.com

excuse. As explained above, the Zoning Administrator, the Planning Commission, and the Land Use Plan previously approved by City Council designated the area as proper for multi-family. Immediately adjacent and behind the Property is an *industrial* park. And, next to the Tanners Crossing site on Hook Avenue is the Jenni-Lynn Assisted Living Community, a *multi-unit* elder care facility.[38] Few, if any, single family homes were directly adjacent to the Property, although some were in the area.[39]

Later, in a private meeting, West Columbia's Mayor told Connelly, Connelly Development's David Christmas and the Baughman's realtor, Craig Waites, that the City opposed Tanners Crossing based on fears that the project would attract "certain undesirables."[40] From the context of the discussion, Mr. Connelly understood that comment to mean that Tanners Crossing would attract minority tenants.[41] Because it was clear that West Columbia was not going to allow development of Tanners Crossing within the City, Connelly had Baughman withdraw the application for annexation and zoning.[42] However, it was not until later in May 2004, that Connelly and Baughman became aware of the City's secret annexation plan for the Hook Avenue area.[43]

3.      Connelly's Effort to Build Tanners Crossing in Lexington County.

After realizing that the City of West Columbia would interfere with Tanners Crossing to prevent its development, and obviously before he knew that West Columbia planned to forcibly annex the Property, Connelly committed time and resources to satisfy SHFDA that the project could still be built under Lexington County's zoning requirements.[44] Ultimately, Lexington

---

[38] *Id.*; Connelly 1/18/06 Declaration ¶31.
[39] See Connelly 8/30/07 Declaration, ¶5; Ex. A. (Satellite photograph of area.)(Declaration filed at this footnote.)
[40] See Section III.B.2.a., *infra*.
[41] Connelly 1/18/06 Declaration ¶32.
[42] Waites Depo. 57:19-58:9.
[43] Connelly 8/30/07 Declaration ¶3 (at fn. 39); see Section III.B.1., *infra*.
[44] Connelly 1/18/06 Declaration ¶33.

9

County agreed that Tanners Crossing was an "allowed activity" with respect to the County's zoning maps.[45] This acknowledgment from the County was sufficient for SHFDA to demonstrate that there were no absolute regulatory impediments to preclude the construction of Tanners Crossing.[46]

    4.    <u>West Columbia Falsifies An Excuse to Block the Project, Again.</u>

At this juncture, Tanners Crossing had progressed to the point that SHFDA was satisfied that Lexington County zoning standards could be met. However, one last approval was needed for SHFDA to award 2004 Tax Credits—namely, the letter certifying that water and sewer services would be made available to Tanners Crossing.[47] As luck would have it, that letter needed to come from the City of West Columbia. It operates the West Columbia Water and Sewer Utility (the "Utility"), and serves that area of Lexington County in which the Tanners Crossing site lies.[48] Sewer service was available to the Property and could have been provided as a matter of course by the Utility though a "tap-in" to existing lines. Indeed, the Utility provided sewer service to the Jenni-Lynn Assisted Living Facility (located next to the Property but further away from the City's boundaries) that was outside the City corporate limits on this same sewer line.[49]

The City was aware that the Project needed sewer and water service; as early as February of 2004, Connelly had forwarded a request for such service to the City.[50] On May 7, 2004, when Connelly planned on building in Lexington County rather than in the City, he asked that the City provide a letter to SHFDA committing the Utility to provide water and sewer service to the

---

[45] Connelly 1/18/06 Declaration ¶¶36-41.
[46] *Id.*
[47] Connelly 1/18/06 Declaration ¶42.
[48] *Id.*
[49] See Section V.C.1., *infra.*
[50] See Section V.D.1., *infra.*

PDF created with pdfFactory trial version www.pdffactory.com

Property.[51]  After repeated inquiry by Connelly about the sewer letter, on June 1, 2004 and following months of review, for the first time the City unexpectedly questioned whether the Utility had sufficient *sewer capacity* to receive the Project's wastewater flows.[52]  Ultimately, on June 14, 2004, the City certified that it was capable of providing water service but did not certify it could provide sewer service.[53]  Time ran out for tax credit financing, just as the City planned. SHFDA notified Connelly that, as of its June 25, 2004 application deadline, the Tier 2 submission for Tanners Crossing was incomplete because it failed to include a letter from the Utility indicating that sewer service was available for Tanners Crossing.[54]  Thus, in the end, Tanners Crossing failed to receive an allocation of 2004 Tax Credits from SHFDA.  The project was dead for 2004.

In truth, there was no sewer capacity problem.  The sudden concern by West Columbia about sewer capacity was a mere pretext, an excuse to delay delivery of the water/sewer letter until either it was either too late for Connelly to receive Tax Credits under the 2004 QAP, or until the City annexed the Tanners Crossing site with zoning to exclude multi-family housing.  In June 2004, at the same time that the City fabricated its "sewer capacity" crisis in the context of Tanners Crossing, the City issued letters to SCDHEC about various businesses and housing developments that had "ample" sewer capacity.[55]  Tellingly, one of these letters was written in mid-June 2004 regarding the Jenni Lynn Assisted Living Facility, which is located directly adjacent to the Property and on the same sewer line that would serve the Project.[56]  For this and other reasons demonstrated *infra*, West Columbia's "sewer capacity" crisis was a false pretext to

---

[51] *Id.*
[52] See Section V.B.3., *infra.*
[53] See Section V.C.2., *infra.*
[54] Connelly 1/18/06 Declaration ¶¶53, 55, 58, 59, and 65.
[55] See Section V.B.1., *infra.*
[56] *Id.*

PDF created with pdfFactory trial version www.pdffactory.com

delay issuing a sewer letter to Connelly, to buy just enough time so it could complete its hurried annexation of the Hook Avenue area.

      5.      <u>The City Annexes the Property and Restrictively Zones it to Prevent Tanners Crossing From Ever Being Built.</u>

Notwithstanding West Columbia's failure to provide the sewer letter, it was possible that the Project could have been revived for the 2005 QAP Tax Credit Allocation. However, the City made sure this would not happen when it abruptly annexed the Hook Avenue area, including the Property, and executed its plan to zone the site so no multi-family housing could ever be constructed. West Columbia called Special Council meetings for June 8 and June 15, 2004, which enabled the annexation ordinance to become law much more quickly than if it had simply had public readings on the ordinance at its normal monthly meetings.[57] The reason for the quiet and hurried annexation was because the City, which knew Connelly would go to Lexington County to build Tanners Crossing if the City refused annexation and proper zoning, wanted to annex and restrictively zone the Property *itself* before Connelly pulled any construction permits from Lexington County (which would have "grandfathered" the Property from the restrictive zoning.)[58]

Therefore, the annexation and the City's determination to prevent Tanners Crossing from being built precluded Connelly from ever developing Tanners Crossing on this Property, through SHFDA's 2005 QAP tax credits or otherwise. For that reason, Connelly allowed the option to lapse; with the City's intent to interfere with the Project now fully exposed, Connelly was not willing to pursue additional, futile attempts to build Tanners Crossing.[59]

---

[57] See Section III.C.2., *infra.*
[58] See Section III.B.1., *infra*
[59] Connelly 8/30/07 Declaration ¶4. (at fn. 39)

PDF created with pdfFactory trial version www.pdffactory.com

Overwhelming circumstantial evidence creates issues of material fact, sufficient to defeat the City's summary judgment motion, showing that West Columbia acted with discriminatory intent to interfere with Tanners Crossing. Further, the Market Study and the statistical analysis of Dr. Jess Teel, raise material questions of fact that West Columbia's actions both (1) had a disproportionate impact on African-American renters who would have been able to lease from Tanners Crossing, and (2) led to the perpetuation of segregation in the Hook Avenue area. In short, there are sufficient facts in question that a jury should decide. With respect, disposition on summary judgment is not appropriate.

## ARGUMENTS

### I.     Summary Judgment Standard.

"A summary judgment proceeding is … 'not the proper forum for assessing the relative weight of conflicting evidence.'" *Murrell v. The Ocean Mecca Motel, Inc.*, 262 F.3d 253, 259 (4th Cir. 2001) (citation omitted). It "cannot be invoked to deprive litigants of their right to trial by jury if there remain genuine issues of material facts to be tried." *Valdosta Livestock Co. v. Williams*, 31 F.R.D. 528, 531 (E.D.N.C. 1962). The Court may not enter summary judgment against a non-moving party when there is a genuine issue as to any material fact. *Smith v. Blackledge*, 451 F.2d 1201, 1202 (4th Cir. 1971). In assessing whether a genuine issue of material fact exists, all facts and reasonable inferences must be construed in favor of the non-moving party. *Murrell*, 262 F.3d at 255.

### II.     Standard for Violation of the Fair Housing Act

#### A.     The Fair Housing Act.

The City's refusal to provide a sewer letter, and annexing the Property to achieve restrictive zoning to preclude multi-family dwellings, each interfered with Connelly's plans to

PDF created with pdfFactory trial version www.pdffactory.com

develop Tanners Crossing and violated the Fair Housing Act (FHA), Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, *et seq.* In the present context, the source of the violations is § 3604(a) of the FHA, which provides that it shall be unlawful to:

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a *dwelling* to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a) (emphasis supplied). The FHA broadly defines the term "dwelling" as "any building, structure, or portion thereof which is occupied as, or designated or intended for occupancy as, a residence by one or more families, *and any vacant land which is offered for sale or lease* for the construction or location thereon of any such building, structure, or portion thereof." *Id.* § 3602(b) (emphasis supplied). Furthermore, the FHA makes it illegal to intimidate, or interfere with the activities of a third party that provides housing opportunities for groups protected under the Act. *See Id.* § 3617 (prohibiting the interference, coercion, or intimidation of "any person … on account of his having aided or encouraged any other person in the exercise and enjoyment of, any right granted or protected" by the Act).

"The courts of appeals ... regularly have provided relief from exclusionary zoning (or its equivalent by refusal to permit tying into city's water and sewer systems through denial of annexation or issuance of permit) under the Fair Housing Act." *Arlington Heights v. Metro. Hous. Dev. Corp.,* 616 F.2d 1006, 1011 (7th Cir. 1980) *citing Kennedy Park Homes Ass'n, Inc. v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970); *United Farmworkers v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974); and *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977). *See also In re Malone*, 592 F.Supp. 1135, 1155 (E.D. Mo. 1984); *Sisters of Providence of St. Mary v. City of Evanston,* 335 F.Supp. 396 (N.D. Ill. 1971) (refusal of city to rezone from single family to multi-family.)

PDF created with pdfFactory trial version www.pdffactory.com

Accordingly, "a number of exclusionary zoning cases have held that a municipality's refusal to permit a developer to build housing for minorities not only violates § 3604(a), but also unlawfully interferes with the developer and his prospective tenants under § 3617." *In re Malone*, 592 F.Supp. at 1156 (citations omitted).

"There are two theories of discrimination by which plaintiffs may proceed under the FHA: (1) disparate treatment; and (2) disparate impact." *Cavalieri-Conway v. L.Butteman & Assoc.*, 992 F.Supp. 995, 1002 (N.D. Ill. 1998), *citing Phillips v. Hunter Trails Community Assoc.*, 685 F.2d 184, 189-190 (7th Cir. 1982); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); and *Doe v. City of Butler,* 892 F.2d 315, 323 (3rd Cir. 1989). *See also Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995).

In this case, Plaintiffs proceed under both a disparate treatment (or discriminatory intent) claim, and a disparate impact (or discriminatory effect) claim.

**B.     Proof of Disparate Treatment/ Discriminatory Intent Claim.**

Plaintiffs' first FHA claim is that West Columbia acted with discriminatory intent in interfering with Tanners Crossing. Discriminatory intent does not have to be the dominant or sole purpose for the defendant's conduct to be actionable. *Town of Clarkton*, 682 F.2d at 1066; *United States v. Pelzer Realty Co.,* 484 F.2d 438, 443 (5th Cir. 1973). It is enough that discriminatory intent was *a* factor in the decision.

A disparate treatment/discriminatory intent claim can be proven by direct or circumstantial evidence. "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent." *Kormoczy v. Secretary, U.S. Dept. of HUD*, 53 F.3d. 821, 824 (7th Cir. 1995)(FHA case.) Plaintiffs do not contend that they have "direct evidence" of discriminatory intent in this case, *i.e.,* there are no known statements by

PDF created with pdfFactory trial version www.pdffactory.com

West Columbia that it interfered with Tanners Crossing for an explicit racially discriminatory reason.[60]   Indeed, in this day and age, "direct proof of unlawful discrimination is rarely available."  *United States v. Badgett,* 976 F.2d 1176, 1178 (8th Cir. 1992).

However, "circumstantial evidence is admissible too, to provide a basis for drawing an inference of intentional discrimination."  *Troupe v. May Dept. Stores Co*., 20 F.3d 734, 736 (7th Cir. 1994).  "A racially discriminatory intent, as evidenced by such factors as disproportionate impact, the historical background of the challenged decision, the specific antecedent events, departures from normal procedures, and contemporary statements of the decisionmakers, must be shown."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 253 (1977).  Other circumstantial evidence of disparate treatment includes "suspicious timing, ambiguous statements, behavior toward or comments directed at [others] in the protected group, and other evidence from which an inference of discriminatory intent might be drawn..." *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

## C.    Proof of Disparate Impact /Discriminatory Effect Claim.

Plaintiffs' second FHA claim is that the facially neutral practices of West Columbia in refusing to issue a sewer letter, and its forced annexation of the Property with restrictive zoning, had a "discriminatory effect" through a "disparate impact" upon African-Americans.  *Smith v. Town of Clarkton,* 682 F.2d 1055 (4th Cir. 1982).  The Fourth Circuit follows the Seventh Circuit by requiring consideration of four factors to prove an FHA claim based on "disparate impact":

(1) the strength of the plaintiff's showing of discriminatory effect;

(2) whether there was some evidence of discriminatory intent;

(3) what the defendant's interest was in taking the action complained of; and

---

[60] Although the statement of the Mayor about "certain undesirables" is close.

PDF created with pdfFactory trial version www.pdffactory.com

(4) whether plaintiff sought to compel defendant to affirmatively provide housing for minorities, or merely to restrain the defendant from interfering with individual property owners who wished to provide such housing.

*See Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982) *citing Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 558 F.2d 1283, 1287-90 (7th Cir. 1977) (*"Arlington II"*).

These cases differ from traditional Equal Protection claims because "at least under some circumstances a violation of [the FHA] can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Arlington Heights II,* 558 F.2d at 1290. The *Arlington Heights II* court also noted that the second factor, focusing on the presence of "some evidence" of discriminatory intent, was the "least important," and that "too much reliance on this evidence would be unfounded." *Id. at 1292.* This is because actual evidence of discriminatory intent can be extraordinarily difficult to find; it does not indicate that evidence of intent should be ignored if it is present in a disparate impact analysis.

1.    Types of Proof of Discriminatory Effect

To prove an FHA violation arising from the discriminatory <u>effect</u> of a municipality's actions upon minorities, two kinds of evidence can be used. First, there is a disparate impact when a municipality's decision "has a greater adverse impact on one racial group than on another." *Arlington Heights,* 558 F.2d at 1290. The reason for this method of proof has been clearly stated. "Effect, and not motivation, is the touchstone ... because clever men may easily conceal their motivations." *United States v. Black Jack,* 508 F.2d 1179, 1185 (8th Cir. 1984).

The Fourth Circuit approves the use of census data by experts to prove disparate impact in FHA cases. *See Smith v. Town of Clarkton,* 682 F.2d at 1060 n.3. In analyzing this type of impact to minorities, the focus should be on "proportional statistics" rather than "absolute numbers." *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 938 (2nd Cir.

PDF created with pdfFactory trial version www.pdffactory.com

1988) (noting that while a greater absolute number of whites were below the poverty line compared to blacks, proportionately blacks were poorer -- 28% blacks compared to 11% whites.) *See also*, Section IV, *infra*. Courts in the Fourth Circuit must use a "standard deviation analysis" for these computations of disparate impact. *See Moultrie v. Martin*, 690 F.2d 1078, 1082 (4th Cir. 1982), *citing Hazelwood School District v. United States*, 433 U.S. 299 (1977).

2.    Perpetuation of Segregation

The second type of discriminatory effect arises where an action "perpetuates segregation" and thus "prevents interracial association" in the community, regardless of whether "it produces a disparate effect on different racial groups." *Arlington Heights,* 558 F.2d at 1290. "'[R]ecognizing this second form of effect advances the principal purpose of Title VIII to promote 'open, integrated residential housing patterns.'" *Huntington Branch,* 844 F.2d at 937 (citing *Otero v. New York Housing Auth., 484* F.2d 1122, 1134 (2nd Cir. 1973)). Using evidence of community segregation, discriminatory impact has been shown where a low-income project, proposed to be built in a white area of town, was denied—and further where construction of low-cost housing was restricted to areas where minorities were already "clustered" or "contained." *See, e.g., United States v. Black Jack,* 508 F.2d 1179, 1183 (8th Cir. 1974); *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108, 110 (2nd Cir. 1970); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988)(finding zoning laws that restricted construction of multi-family housing to predominantly white neighborhoods within city perpetuated segregation.)

**D.    The FHA Overrules Local Official's Discretion and State Law.**

The discretion of zoning officials is not paramount in a FHA analysis. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial

PDF created with pdfFactory trial version www.pdffactory.com

deference is no longer justified." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "The discretion of local zoning officials ... must be curbed where the clear result of such discretion if the segregation of low-income Blacks from all White neighborhoods." *City of Black Jack,* 508 F.2d at 1185. "A city that takes steps to exclude black people violates the Fair Housing Act, regardless of whether they do so out of a desire to protect property values and not out of any animus against black people generally." *United States v. City of Birmingham,* 538 F.Supp. 819, 839 (E.D. Mich. 1982). Thus, the mere fact that the municipality exercises legitimate zoning powers is no excuse if its actions are discriminatory. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2nd Cir. 1995). "If defendants' actions were undertaken with a discriminatory intent, the FHA is violated even if those actions were otherwise justifiable under state law." *Fowler v. Borough of Westville*, 97 F.Supp.2d 602, 612 (D.N.J. 2000).

### III.    There is Overwhelming Circumstantial Evidence of West Columbia's Disparate Treatment/Discriminatory Intent.

In today's society, rarely will there be overt evidence of racial animus as the motivating factor in government decision-making. "[O]verly bigoted behavior has become more unfashionable." *Metro. Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977). As the Fourth Circuit stated:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this.

PDF created with pdfFactory trial version www.pdffactory.com

*Smith v. Town of Clarkton,* 682 F.2d at 1064. Plaintiffs admit that no member of the West Columbia City Council made any outright announcement of discrimination at one of their meetings, when they deliberated the fate of Tanners Crossing. But for FHA purposes, that does not matter. There is substantial circumstantial evidence of racial intent, under the factors listed by the Supreme Court in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 253.

      A.    <u>Discriminatory or Segregative Effect</u>.

Plaintiffs' showing of discriminatory effect is discussed Section IV *infra*, which addresses disparate impact.

      B.    <u>The Historical Background and Sequence of Events Leading to the Decision.</u>

      1.    *The Secret and Hurried Annexation of the Property.*

On April 13, 2004, the West Columbia City Council first formally heard Connelly's proposal for the Tanners Crossing project and his application for annexation and multi-family zoning of the Property. Shortly thereafter, Councilman B.J. Unthank first met with Councilmember Jack Harmon to discuss the Tanners Crossing project, and Harmon raised the issue of a possible annexation.[61] Harmon was opposed to Tanners Crossing,[62] although he did not say so at the April 13, 2004 meeting on the record.

After the Council meeting, Unthank asked Jennifer Cunningham, the City's Administrator, who could assist him with an annexation petition; she told him to contact Myron Corley.[63] Shortly thereafter, Unthank provided the boundaries of the proposed annexation to Corley, so Corley could examine Lexington County records to obtain property ownership and

---

[61] Unthank Depo. 52:14-55:3. (See partial deposition transcript and exhibits filed with this footnote.)
[62] Harmon admitted this to an annexation petitioner. Lynch Depo. 25:20-26:23; 46:1-15.
[63] Cunningham Depo. 34:17-35:25.

PDF created with pdfFactory trial version www.pdffactory.com

valuation information and report back to Unthank.[64]  Unthank had met with Harmon and his wife to gather this information.[65]  Unthank gave Corley this information within three days of the Council meeting as reflected in Corley's daily log on Friday, April 16, 2004, which states that he was preparing "Hook Ave. annexation info for B.J. Unthank."[66] Corley then provided this information regarding Hook Avenue neighbors and surrounding areas to Unthank by Monday, April 19th, and Unthank thanked him for it.[67]  Thus, it was Unthank, a member of City Council, who determined the boundaries of this proposed annexation (not the Hook Avenue neighbors, as West Columbia suggests.)[68]

In the next few days, Corley communicated repeatedly with B.J. Unthank and Unthank's wife, Christie (who assisted Unthank in this process), about the Hook Avenue annexation.[69] During this time as well, Councilmember Harmon first met with Horace Meetze, who in the past attempted to circulate an annexation petition of his and other property in the Hook Avenue area, but whose efforts had twice failed.[70]  Significantly, Meetze's former petitions had only included property *east* of Hook Avenue.  But on this occasion, Harmon presented Meetze with a proposed annexation area that for the first time included the area *west* of Hook Avenue—and in particular the Property where Tanners Crossing was to be located.[71]

Harmon and Meetze discussed the proposed Tanners Crossing project in this initial meeting.[72]  (Harmon was skilled in this process—he had utilized the same annexation procedure to stop a mobile home park expansion years before when his property was annexed into West

---

[64] Corley Depo. 214:19-217:18.
[65] Unthank Depo. 56:5-21. (See transcript filed at Fn. 61.)
[66] Corley Depo. 213:25-215:7.
[67] Corley Depo. 219:1-7.
[68] Corley Depo. 62:18-63:10; 89:6-13.
[69] Corley Depo. 221:9-222:9; 223:19-224:11; 227:2-228:25; 230:9-231:11.
[70] Meetze Depo.14:19-15:10; 17:22-18:1.
[71] Meetze Depo. 20:25-22:16; 23:9-24:21; 26:4-17; 27:10-29:13.
[72] Meetze Depo. 66:17-22.

PDF created with pdfFactory trial version www.pdffactory.com

Columbia.[73]) Meetze would then work with the Unthanks to circulate the petition.[74] Thus, West Columbia officials, not Meetze, introduced the concept of annexing the Tanners Crossing site for the first time in this third annexation attempt.

South Carolina law requires that signatures from 75% of the property owners were needed to agree to an annexation. Unthank reviewed the annexation properties suggested by Corley, and removed commercial properties whose owners would not consent to annexation because they did not want to pay additional City taxes and fees.[75] Further, as Corley admitted in statements he made to a third party, some of the businesses could not respond with the speed with which the neighbors wanted to act.[76]

Unthank also removed at least six residential property owners who indicated that they did not want the City to annex their land.[77] This removal left "islands" of Lexington County property completely surrounded by West Columbia city limits.[78] Unthank admits that such piecemeal annexation was contrary to the City's usual approach: "[W]hen you annex, you want to take in … as much as you possibly can."[79] (Indeed, Unthank cited this policy as the reason he *included* the Tanners Crossing Property in the annexation.[80]) Thus, the removal of these properties from the annexation was contrary to Unthank's stated interest in annexing the Tanners Crossing site.

Further, the resulting "islands" of Lexington County actually could have been proven detrimental to West Columbia's growth since it would be impossible for West Columbia to

---

[73] Harmon Depo. 19:14-20:5.
[74] Meetze Depo. 31:21-24. Meetze believed that he and Christie Unthank were the only two persons circulating the petition.
[75] Unthank Depo. 101:11-103:25; 111:16-114:11. (See transcript filed at Fn. 61.)
[76] Phillips Depo. 17:16-20:7.
[77] Unthank Depo. 64:1-21; 101:11-104:8.108:6-111:15. (See transcript filed at Fn. 61.)
[78] Corley Depo.114:15-126:1. See Ex. 65 showing islands. Many of these properties were subsequently annexed into West Columbia, but were not part of the Hook Avenue annexation.
[79] Unthank Depo. 56:5-17; 107:3-22. (See transcript filed at Fn. 61.)

PDF created with pdfFactory trial version www.pdffactory.com

subsequently annex these islands without their owner's unanimous consent. *See* S.C. Code 5-3-150(3).[80] Therefore, the Hook Avenue annexation actually *harmed* West Columbia's ability to annex future properties that otherwise were surrounded by its corporate limits, suggesting an inference that the annexation was motivated by something other than a City's normal desire to grow. Finally, Unthank does not deny that a reason the Property was included in the annexation was *because* of the pending Tanners Crossing project.[82]

By April 22, 2004, within nine days of the prior City Council meeting, Corley had finalized an annexation area and petition that he gave to the Unthanks to circulate among affected property owners.[83] The Unthanks then circulated the petition among the annexation petitioners.[84] Tanners Crossing was discussed when the Unthanks and Meetze circulated the petition.[85] B.J. Unthank then returned the signed petition to Corley.[86] While these City officials were executing their annexation plan, they never told either Connelly or Baughman of the existence of this annexation petition.[87]

As stated *supra*, at the April 13, 2004 City Council meeting, Unthank tabled Connelly's re-zoning request for the express purpose of viewing another low income housing project built by Connelly in Orangeburg, called Hampton Chase. Such a trip was unprecedented.[88] Thus, during the very time that Unthank and Corley were conspiring on the petition to forcibly annex the Property—*unbeknownst* to Connelly—they were arranging the Hampton Chase site visit *with*

---

[80] Unthank Depo. 114:21-115:1. (See transcript filed at Fn. 61.)
[81] Unthank Depo. 115:3-20. (See transcript filed at Fn. 61.)
[82] Unthank Depo. 116:8-15. Unthank states "I wouldn't say it had nothing to do with it..." Also see Unthank Depo. 118:12-119:4. (See transcript filed at Fn. 61.)
[83] Corley Depo.230:9-23.
[84] Corley Depo. 101:6-102:7.
[85] Christie Unthank Depo. 16:1-17:1; Meetze Depo. 62:7-16; 67:16-22.
[86] Corley Depo. 70:2-20.
[87] Corley Depo. 143:7-16; Unthank Depo. 71:13-72:8. (See transcript filed at Fn. 61.)
[88] Horton Depo. 21:14-20.

PDF created with pdfFactory trial version www.pdffactory.com

Connelly.[89]   During Corley and Unthank's April 28, 2004 trip to Orangeburg (with City Councilman Dale Harley), they never told Connelly about the Hook Avenue annexation petition that was being circulated in the area at that time.[90]   On the day of the site visit, Corley talked to Harmon about the annexation petition.[91]   The day after the Orangeburg trip, Corley and Unthank continued their work on the annexation petition.[92]   Corley talked to both Waites and Connelly that day, but again did not disclose the annexation petition.[93]

Notably, even though the Property owned by Mrs. Baughman was included in this annexation attempt, the Unthanks did not tell her about it.  The Unthanks admitted they did not think she would sign the petition because the zoning that would be imposed after annexation would accommodate only single-family housing, and Baughman was trying to sell the Property to Connelly for a multi-family housing project.[94]

Thus, the only reason the Unthanks knew Mrs. Baughman would not sign the annexation petition, and the only reason no West Columbia official told Connelly about the petition, is that the annexation would result in a restrictive zoning to prohibit Tanners Crossing's development. This motivation is further reflected by Unthank's varying treatment of Baughman compared to other Hook Avenue land owners, whose properties were removed from the annexation when they did not provide consent to be annexed.

Unthank and Corley continued laboring on the annexation after the Orangeburg trip, and Corley picked up the annexation petitions from Christie Unthank on May 3, 2004.  Corley then

---

[89] Corley Depo. 229:1-25; 236:17-237:25.
[90] Unthank Depo. 46:25-47:3; 70:13-71:12; (See transcript filed at Fn. 61.) Corley Depo. 241:14-20.
[91] Corley Depo. 241:21-242:2.
[92] Corley Depo. 243:5-244:6.
[93] Corley Depo. 244:7-245:5.
[94] Christie Unthank Depo. 33:13-34:17; Unthank Depo. 72:17-25; 73:19-74:21; (See transcript filed at Fn. 61.) Baughman Depo. 71:14-18. Baughman said she was originally unaware of the annexation ordinance as well.  Depo. 73:19-74:8.

PDF created with pdfFactory trial version www.pdffactory.com

rapidly converted the petitions into an annexation ordinance,[95] which was then scheduled for new business during the latter part of the City Council's May 4, 2004 meeting. Yet, earlier at that same meeting., the City Council refused to accept the Planning Commission's recommendation on zoning, effectively killing Tanners Crossing's construction in West Columbia. Unknown to Baughman's and Connelly's representatives, who left the meeting after their re-zoning request was denied, the City Council later proceeded to approve the ordinance for the Hook Avenue annexation, which included the Property.[96]

West Columbia had good reason to hurry through the annexation. It was aware that even if it did not agree to zone the Property for multi-family housing, the zoning in Lexington County would allow such housing.[97] It was also aware that if Connelly proceeded far enough to obtain Lexington County approvals, the Property would be grandfathered under the County's multi-family zoning and the City's annexation would not achieve the intended interference with the Project.[98]

Consequently, West Columbia was in constant communication with Lexington County's Zoning Department personnel to know the status of the Tanners Crossing project.[99] Indeed, Corley or McKinnon were interested in talking to Joyce Munsch, Lexington County's Zoning Administrator, about Connelly Development on April 20 and 21, 2004, while Corley was still preparing the Hook Avenue annexation petition.[100] During the annexation process, City Administrator Cunningham also admits to talking with Lexington County see if there were any

---

[95] Corley Depo. 245:10-247:15.
[96] Connelly 8/30/07 Declaration ¶3 (at fn. 39)
[97] McKinnon Depo. 103:1-14; see Exhibit 4, Page CWC01504 "West Columbia Planning Commission Case Evaluation" where McKinnon notes that Lexington County had the area zoned for multi-family.
[98] Cunningham Depo. 30:4-31:22.
[99] Hiller Depo. 35:14-38:3. This communication was formalized. For example, Hiller says in written fax to Corley "[i]n the spirit of our commitment to cooperate with one another regarding the above-reference project..." Depo. 38:4-22. Hiller admits to talking to Corley about Tanners Crossing "on several occasions." Depo. 41:9-14.
[100] Corley Depo.225:8-226:11; 227:17-228:18.

PDF created with pdfFactory trial version www.pdffactory.com

pending building permits for Tanners Crossing, because she knew that West Columbia would have to honor those permits even if it annexed and restrictively zoned the Property.[101] Cunningham herself had *never before or since* inquired into the status of permits for an annexation.[102] Again, this indicates the importance to West Columbia of the status of Lexington County approvals for Tanners Crossing.

West Columbia's need for speed is reflected in a May 3, 2004 email of a former preacher at West Columbia's Chinese Christian Church, Dr. Phillips. This email details his conversations with Myron Corley, where he notes the "Motivation" for the annexation: "[t]here is a plan for construction of subsidized housing in the area, and the neighbors feel that this is not in their best interests as long-term single family residents. They felt that the city of West Columbia could give them better zoning protection than Lexington County, thus the quick petition."[103]

Thus, this annexation was started by City Council members within days, if not hours, of their discovery that Tanners Crossing would be a low income housing project. Contrary to West Columbia's assertions,[104] the annexation attempt was initiated not by residents of the Hook Avenue area, but by Council Members Unthank and Harmon, who then proceeded to determine the property area to be annexed, organized the community, assisted in circulating the annexation petition, and ultimately controlled the entire process from start to finish. But while pressing for annexation, West Columbia officials maintained the charade with Connelly that it was impartially investigating Tanners Crossing's suitability by taking a trip to Orangeburg to view Hampton Chase.

---

[101] Cunningham Depo. 30:4-31:22.
[102] Cunningham Depo. 33:12-17.
[103] See Phillips Depo. 17:16-20:7. While Dr. Phillips was not sure if these statements were made by neighbors or Myron Corley, the context of the email strongly suggests it was Corley. Regardless, it affirms the motivation behind the annexation was to stop Tanners Crossing as quickly as possible.

PDF created with pdfFactory trial version www.pdffactory.com

In short, in light of the suspicious chain of events leading up to the annexation, a jury could reasonably infer that West Columbia never intended to fairly consider Connelly's rezoning request at the May 2004 Council meeting. Rather, the annexation was a *fait accomplit*. Feigning interest in Connelly's rezoning request gave the City needed time to organize community opposition to the Project, inquire on the status of County approvals, achieve annexation—and block the Tanners Crossing.[105]

Plaintiffs do not claim that West Columbia violated South Carolina's annexation or zoning laws. The actions West Columbia took in annexing the property, if taken without discriminatory intent (or without discriminatory effect),[106] would not have been illegal. Thus, if West Columbia did not have a nefarious and discriminatory motive behind its actions, it need not have gone to such lengths to conceal the otherwise legal annexation from Connelly and Baughman and move so rapidly. The fair inference drawn from this circumstantial evidence is that West Columbia went to such extreme lengths to conceal an otherwise legal exercise of municipal discretion because of its illegal intent.

2.      *The Comments of City Officials and the Neighbors.*

Notwithstanding West Columbia's protestations to the contrary in its Memorandum, statements made by those involved in the decision-making process are relevant circumstantial evidence of intent in a Fair Housing Act case. *See e.g.*, *Smith v. Town of Clarkton,* 682 F.2d at 1066 (in context where black residents might move into racially segregated town, residents' expressions of dislike towards such "'new' people" was among "strong testimonial evidence" of

---

[104] West Columbia 30(b)(6) Depo. 15:5-12, where the City states that "[t]hey [the citizens] came to us with the desire to annex, with a petition," and characterizes its annexation as "responding to citizen's concerns and needs." (See full West Columbia Rule 30(b)(6) deposition transcript and exhibits at this footnote.)

[105] Although Unthank and Harmon did not make up a majority of City Council, City Council members usually looked out for their own district, and not someone else's district. Harley Depo. 41:1-15. The annexed property was to be in Harmon's district. Harmon Depo. 43:10-20.

[106] Or discriminatory impact, *see* Section IV, *infra*.

PDF created with pdfFactory trial version www.pdffactory.com

racial bias); *Atkins v. Robinson,* 545 F.Supp. 852, 872 (E.D. Va. 1982)("In *Smith v. Town of Clarkton* ... the court found hidden racial meaning in the town mayor's concern about an influx of 'undesirables' if the project were built"); *Resid. Adv. Bd. v. Rizzo*, 564 F.2d 126, 144 (3rd Cir. 1977)(citing statements by mayor such as his intent to "preserve city neighborhoods" as evidence of discriminatory intent); *Dews v. Town of Sunnyvale,* 109 F. Supp.2d 526, 545 (N.D. Tex. 2000)(Town indicated it wanted to keep out an "undesirable element;" court found FHA violation); *Fowler v. Borough of Westville*, 97 F.Supp.2d 602, 613 (D.N.J. 2000)(town official's statement that he was against "those people" was part of evidence sufficient to withstand summary judgment); *Birmingham*, 538 F.Supp. at 825 (holding that statements about "those people" and their effect on values was intended to refer to minorities); *Green v. Westgate Vill.*, 2000 WL 562331 *3 (N.D. Ohio 2000)("[b]ased upon Mr. Liebengood's comment alone, I find that plaintiffs have provided enough evidence to survive summary judgment. ....In the fair housing context ...where the parties do not have such frequent and consistent contacts, a so-called 'isolated remark' is more probative of racial animus than it might be in other situations."); and *United States v. Gilman,* 341 F.Supp. 891, 903 (S.D. N.Y. 1972)(term "undesirable people" was a racially discriminatory remark.)

The case at bench is a successor to this long line of cases. West Columbia officials and persons closely involved in the annexation made a number of off-putting statements, providing overwhelming circumstantial evidence that racial animus was a driving force behind annexation and refusal to rezone for multi-family use.

PDF created with pdfFactory trial version www.pdffactory.com

### a. The Mayor's Statement about "Undesirables."

On June 13, 2004, after City Council voted to reject the Planning Commission's recommendation of zoning to accommodate multi-family housing, Kevin Connelly, David Christmas, and the Mrs. Baughman's realtor, Craig Waites, met with Mayor Horton and Myron Corley to discuss if City Council could be persuaded to change its vote.[107]  During that meeting, and as supported by the testimony of three witnesses, Mayor Horton stated he did not believe that City Council would change its vote because the feeling among the members was that they wanted to exclude "**certain undesirables**" from the Hook Avenue area.[108]  Again, the Fourth Circuit in *Town of Clarkton, supra,* deemed use of the word "undesirables" as evidence of discriminatory intent.

### b. The Neighborhood Advocate's Statement about "Undesirables."

Horace Meetze, the neighborhood annexation advocate who unsuccessfully sought annexation of his property by West Columbia on two prior occasions, also admitted that he was opposed to Tanners Crossing because it would attract "**undesirables**" to the area.[109]  This statement is significant because Meetze admitted that, while he was gathering signatures for the annexation petition, he mentioned the Tanners Crossing project and told petitioners that the annexation might prevent the multi-family project from being built.[110]  Indeed, Meetze admitted that in his conversations with neighbors who signed the petition, some expressed similar

---

[107] Connelly Depo. 109:2-116:23. (See partial deposition transcript at this footnote.)
[108] Connelly Depo.116:2-5; 117:3-8; (See depo. transcript at fn. 107.) Christmas Depo. 91:9-22; Waites Depo. 60:4-61:3; 61:17-19.
[109] Meetze Depo. 68:15-19.
[110] Meetze Depo. 62:7-16.  Meetze admits to discussing the proposed Tanners Crossing project with Harmon prior to the annexation as well.  Depo. 67:16-22.

PDF created with pdfFactory trial version www.pdffactory.com

sentiments about Tanners Crossing.[111]   The inference is that Meetze was telling his neighbors that they needed to sign the annexation petition to keep "undesirables" out of the neighborhood.

"[I]t is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals." *Dailey v. Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970). "When the State ratifies the discriminatory acts of a private party, it is discriminating, period." *Dunn v. Washington County Hospital,* 429 F.3d 689, 694 (7th Cir. 2005). "[G]overnment officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others." *County of Charleston v. Sleepy Hollow Youth, Inc.*, 530 S.E.2d 636, 641 (S.C. App. 2000)(FHA case in state court.)

### c.   The Planning Commission Member's Statement about "Undesirables."

Emily Baughman, the owner of the Property, also heard Planning Commission member Buchanan state at some point around the March 29, 2004 meeting, that he was concerned about the "**undesirables**" the Project may bring to the area.[112]   This is the third instance of those closely involved with West Columbia where the term "undesirables" was used in connection with the future tenants of Tanners Crossing.

### d.   The Remarks of Annexation Petitioners.

There is substantial circumstantial evidence of improper community intent behind the official actions of West Columbia's City Council.   In a FHA case, "[e]vidence of community opposition voiced to the ZBA, Planning Commission, and the City Council is, of course, relevant to [oppose] the City's motion for summary judgment on the Government's intentional discrimination claim." *United States v. City of Chicago Heights*, 161 F. Supp.2d 819, 831 (N.D.

---

[111] Meetze Depo. 68:15-69:1.
[112] Baughman Depo. 91:17-92:13.

PDF created with pdfFactory trial version www.pdffactory.com

Ill. 2001).  "If ... a zoning board's response to political pressure amounts to implementation of local resident's discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination."  *Jackson v. City of Auburn*, 41 F.Supp.2d 1300, 1311 (M.D. Ala. 1999). *See County of Charleston v. Sleepy Hollow Youth, Inc.*, 530 S.E.2d at 641.  In this case, West Columbia admits that it was "responding to the people who want to annex ...."[113] Thus, if those citizens had discriminatory intent, the City in effectuating their intent violates the FHA even if the City itself did not have such intent.

For example, various annexation petitioners testified that they were concerned that Tanners Crossing would become a "Gentle Pines," a low income housing project located in what one resident called "Happy Town," an integrated area of West Columbia.[114]  One annexation petitioner did not want a place like Gentle Pines where "there's people in the streets ... and they don't want to get out of your way.... some of that attitude."[115]  Another petitioner said that he felt the development would lower housing values and "we have too many trailer parks and too many low-income, high density places in West Columbia already."[116]  He did not want Tanners Crossing in his area because of the type people that would live there.[117]  Another witness noted that the "motivation" of the neighbors for the annexation was to keep out a "subsidized housing project."[118]

---

[113] West Columbia 30(b)(6) Depo. 16:5-18; 17:18-18:5. (See transcript filed at Fn. 104.)

[114] Geer Depo. 45:6-47:4; Hicks Depo. 22:24-27:14. Geer also conveyed her desire to stop Tanners Crossing to Councilman Unthank.  Geer Depo. 31:8-32:10. One Councilman stated that he would have "loved" for the Tanners Crossing project to go in the Gentle Pines area.  Harley Depo. 39:1-16.

[115] Geer Depo. 45:6-46:23. As noted by Harmon, Gentle Pines had been part of his district originally, but it was no longer because "[t]hey put it in the minority district."  Harmon Depo. 67:19-68:9.

[116] Hicks Depo. 13:15-14:13.

[117] Hicks Depo. 25:21-27:14.

[118] Phillips Depo.  17:16-20:7.

PDF created with pdfFactory trial version www.pdffactory.com

One annexation petitioner had no problem with the Jenni Lynn Facility, and distinguished between it from Tanners Crossing because "old-age people ain't going to hurt you."[119]  This resident objected to Tanners Crossing because it "probably would have a lot more gangs over there and probably have a lot more other stuff over there."[120]  He thought Tanners Crossing would bring "drugs" and "prostitution" to the area, and noted that "*one got killed* not long ago riding his bicycle over here, and several others got killed just around apartment and stuff like that.[121]  [sic](Italics added.)  He noted that "everybody was upset about it" and that they "sure wouldn't want – want no project like that out there no – next to their homes or around their homes."[122]  This type of opposition to low-income housing because of fears of crime and the fact that the housing will become run-down has been considered "'camouflaged' racial expressions." *Atkins v. Robinson*, 545 F.Supp. at 872.

Thus, discriminatory intent may be inferred from the comments of many of the annexation petitioners, as well as the testimony of the main neighborhood annexation advocate, Meetze. Clearly, West Columbia was, in some part, carrying out their intent.

e.  The Questioning and Statements of Council Members.

During Connelly's presentation to City Council, he was asked several questions by City Council members that reflected their potential discomfort with the "undesirables" that would live in Tanners Crossing.  Harmon asked if Tanners Crossing would be subsidized housing.[123]

---

[119] Lynch Depo. 17:19-18:6.
[120] Lynch Depo. 19:20-20:16. Lynch conveyed his thoughts to Councilman Harmon.  Lynch Depo. 20:17-21:3; 23:23-24:6. This occurred after the Planning Commission approved Tanners Crossing originally. Lynch Depo. 25:20-26:23.
[121] Lynch Depo. 22:18-23:13; 34:7-35:19.
[122] Lynch Depo. 27:16-28:15.
[123] Harmon Depo. 34:14-36:10. Harmon could not articulate why it was so important to find out if it was subsidized housing, stating "well, it really didn't make no difference, but I – I was just asking questions" and "that was just a question I asked, I don't know." Harmon Depo. 35:9-11 and 38:10-16.

PDF created with pdfFactory trial version www.pdffactory.com

Another inquired if the tenants would be using Section 8 federal housing vouchers.[124] Such "ambiguous comments" provide an inference of discriminatory intent. *Huff v. UARCO, Inc.*, 122 F.3d at 380.

Councilmember Harmon stated he did not support the Tanners Crossing project because it would "have people running in and out all the time" and this was different from Jenni-Lynn because "you don't have people out in the yard playing and whatever..."[125] (These statements also suggest a discriminatory intent toward *families*, which also violate the FHA. 42 U.S.C. § 3604(a).)

      f.   The "Bantu" Comment.

It is undisputed that Planning Commission member Buck Buchanan asked during the March 29, 2004 meeting if Tanners Crossing was meant to house members of the Bantu tribe, who were at that time being partially relocated from Africa into the West Columbia/Cayce area.[126] He also asked if the project would be subsidized by the government.[127] Notwithstanding the fact that Mr. Buchanan and the Planning Commission voted in favor of the multi-family zoning, this is more evidence that race played a factor in the process and was on the minds of City officials. *See Housing Investors, Inc. v. City of Clanton*, 68 F.Supp.2d 1287, 1300 (M.D. Ala. 1999)(questions asked by Planning Commission related to racial makeup of proposed apartment complex "underscored" other evidence making summary judgment against plaintiff improper, notwithstanding fact that Planning Commission voted in favor zoning of that project.)

---

[124] Cantrell Depo. 22:17-23:15. This councilman unbelievably suggested that he asked the question because did not know what a voucher was, which begs the question of why he would ask if the project was going to accept such vouchers before he asked what they were.
[125] Harmon Depo. 33:15-34:6.
[126] Buchanan Depo.42:5-43:23; Connelly Depo. 80:22-81:16. (See transcript filed at Fn. 107.)
[127] Buchanan Depo. 35:19-36:3.

PDF created with pdfFactory trial version www.pdffactory.com

3.      *The Pretextual "Sewer Capacity" Crisis.*

As demonstrated *infra* at Section V, West Columbia went to extreme lengths to create a fictional "sewer capacity" crisis as a reason to deny sewer service to the Property. This pretextual excuse is also evidence of discriminatory intent. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)("Thus, a showing of pretext *is* evidence which allows a jury to infer a discriminatory intent.")

This is not the first time a city has used the power to withhold utility certification to improperly stop a low-income housing project. The Second Circuit held that a municipality violated the FHA by refusing to sign a form allowing a low-income housing development to connect to a city's sewer line. *See Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108 (2nd Cir. 1970). The court also invalidated the city's use of a restrictive zoning ordinance that would have prohibited the project:

> [T]he subdivision requested permission to tie into the City sewer system. Before the Erie County Health department will consider such requests, it must receive a 'Sanitary Form 5,' which is an application by the City on behalf of a subdivider to approve the sewer extension. The Mayor refused to sign this form. Without the sewer permit, the black citizens were unable to proceed with the project. .... As soon as the Mayor certifies the necessary sewerage form, the consummation of the project could be effected. .... The final act in this discriminatory pattern is the Mayor's refusal to approve the sewer application following repeal of both ordinances.

*Id.* at 111-15. Indeed, the City of Lackawanna, like West Columbia here, claimed that because of needed sewer improvements, a moratorium on all development in the area of the proposed project was necessary "until such time as the sewer problem was solved." *Id.* at 111. However, this subterfuge did not fool the Second Circuit. It noted that the sewer problem had existed for years, and previously Lackawanna had done nothing about it. *Id.* at 114. Thus, the *Kennedy*

PDF created with pdfFactory trial version www.pdffactory.com

*Park* court saw through the city's false excuse of sewer capacity to defeat a low income housing development. This Court should do no less here.

C.    <u>West Columbia Departed from its Normal Procedural Sequence</u>.

1.    *City Council Overruled its Zoning Administrator and the Planning Commission*.

The City Council's action in refusing to follow the Planning Commission's recommendation and its own Land Use Plan was nearly unprecedented, and at best was extremely rare.

2.    *City Council Called a Special Meeting to Rush the Annexation*.

Rather than wait for its usual monthly Council meeting, West Columbia called two "Special" Council meetings—first on June 8 and then on June 15, 2004—for sole purpose of providing public notice of the Hook Avenue annexation ordinance.[128]  Never before had West Columbia called such special meetings for the purpose of an annexation.[129]  West Columbia created these special meetings specifically to speed through this annexation, which as demonstrated above, was motivated by the pending Tanners Crossing project.

3.    *The City did not Obtain Pre-Clearance from the U.S. Dept. of Justice*.

West Columbia notes that its "annexations have been pre-cleared by the United States Department of Justice."[130]  However, there is no evidence of such pre-clearance for the Hook Avenue annexation of a mostly white populated area. This is additional evidence of a departure from the City's normal sequences.

---

[128] See Corley Depo. 184:24-189:20; McKinnon Depo. 178:14-23; 180:2-14; Ex. 33.
[129] Corley Depo. 189:8-20; McKinnon Depo. 178:14-23. Corley attempts to explain that the law had changed, but he does not explain why a special meeting was necessary as opposed to a regular council meeting.
[130] West Columbia memo, p. 4; *see also* Bowers Depo. 19:17-20:15.

PDF created with pdfFactory trial version www.pdffactory.com

4.     *West Columbia Could Issue Sewer Approval Without City Council Involvement.*

The issue of whether or not West Columbia would issue a sewer letter was taken up by City Council at its June 1, 2004 meeting.[131]  However, "generally a water and sewer letter can be issued without council input."[132]  Indeed, in the past, West Columbia had entered into a "gentleman's agreement" with a developer outside of the City to provide water and sewer service without any evidence of Council action.[133]  Thus, the 'requirement' that City Council approve the sewer letter departed from West Columbia's normal practice as well.

D.     <u>West Columbia Departed from its Normal Substantive Criteria.</u>

1.     *The City Council Rejected the Recommendation of its Own Comprehensive Land Use Plan.*

West Columbia's Comprehensive Land Use Plan implemented under South Carolina law provided that the Property should, if annexed into the City, be zoned multi-family.[134]  This Plan was approved by the Planning Commission and thereafter approved by the City Council following public notice and input as required by South Carolina law.[135]  Generally, a city is supposed to follow its Land Use Plan when making zoning decisions about newly annexed areas.[136]  This is why such a plan exists.  "A local comprehensive land use plan is a statutorily mandated legislative plan to control and direct the use and development of property within a county or municipality.  The plan is likened to a constitution for all future development within the governmental boundary."  *Machado v. Musgrove,* 519 So.2d 629, 631-32 (Fla. Dist. Ct. App. 1987)(citations omitted.)

---

[131] McKinnon Depo.  176:25-177:10. See Ex. 30, Minutes of 6/1/04 Council Meeting, Agenda Item III B.
[132] Cunningham Depo. 62:7-22.
[133] Varn Depo. 50:11-51:5.
[134] See McKinnon Depo. 106:22-107:6; 128:14-23; Ex. 5; Shuler Depo. 12:12-15.
[135] See Shuler Depo. 16:2-22. Mr. Shuler is the researcher and author the West Columbia Land Use Plan as an employee of the Central Midlands Council of Governments.  Shuler Depo.7:16-9:1.
[136] Shuler Depo.15:17-16:1.

PDF created with pdfFactory trial version www.pdffactory.com

The Land Use Plan contains recommended zoning classifications for areas outside the City where growth is anticipated.[137] The primary governmental policy underlying West Columbia's Land Use Plan for its possible areas of expansion is to "avoid the encroachment of commercial development into existing or established neighborhoods."[138] West Columbia's Comprehensive Plan specifically provides as one of its goals "[t]o preserve the residential characteristics of neighborhoods from commercial and industrial encroachment," and to "promote a variety of residential densities for the development of affordable, quality housing while blending in with the character of the surrounding area."[139] Nowhere does the Land Use Plan say that multi-family housing is incompatible with a residential neighborhood. Certainly, a multi-family housing project is not a "commercial" or "industrial" use by any zoning definition.

Therefore, it is no surprise that West Columbia's Zoning Administrator recommended to the Planning Commission that the Property be zoned multi-family based in part on the Land Use Plan.[140] In reaching that recommendation, the Zoning Administrator reviewed the Land Use Plan, toured the Hook Avenue area to determine the character of surrounding properties, and summed up her findings by stating "[t]he staff recommendation would be to establish a zoning classification of the property as R-1, since a large rental project is an appropriate permitted use in that zoning district."[141] The Planning Commission agreed with the Zoning Administrator, despite some community opposition.[142]

These recommendations were consistent with the long-term uses of the parcels in this area, as well as Lexington County's zoning of the Property.[143] While there were single-family

---

[137] *Id.*
[138] Shuler Depo. 13:24-15:4; West Columbia 30(b)(6) Depo. 13:7-16:20. (See transcript filed at Fn. 104.)
[139] West Columbia 30(b)(6) Depo. 14:196. (See transcript filed at Fn. 104.)
[140] McKinnon Depo. 104:23-105:11; 106:9-107:11; Ex. 4, at fn. 97
[141] *Id.*
[142] McKinnon Depo. 34:13-25; Lynch Depo. 21:20-23:19.
[143] See Connelly 1/18/06 Declaration ¶25.

PDF created with pdfFactory trial version www.pdffactory.com

residences in the area, the Property was adjacent to an existing multi-family use (that is, the Jenni Lynn Assisted Living Facility), it bordered the Chinese Christian Church, and the back of the property was contiguous to an industrial park.[144]  As noted by West Columbia's land use planner who designed the Comprehensive Plan, it is his standard policy and practice to put multi-use zoning in areas between residential and commercial corridors.[145]  Up to this point in the process, West Columbia's actions accorded with its normal plan and practice.

However, once City Council members became aware of Tanners Crossing and the neighboring community started to focus on the Project, the City Council refused to accept the prior zoning by Lexington Country, the West Columbia Zoning Administrator's recommendation, and the Planning Commission's decision.  The Council even ignored its own recommendations that it had previously adopted in its comprehensive Land Use Plan.  In the past 14 years, from at least 1990 to the point it considered Tanners Crossing, the West Columbia City Council rejected the Planning Commission's recommendation on only two occasions,[146] out of approximately 160 such recommendations.[147]  And, the City Council had *never* previously rejected the Planning Commission's recommendation that a property be zoned to accommodate multi-family housing.  Indeed, on one of these two occasions when it did reverse the Planning Commission, the Council overturned the Planning Commission's refusal to zone for a higher density residential development in order to approve an upscale housing development.[148]

---

[144] Connelly 1/18/06 Declaration ¶31.
[145] Shuler Depo. 17:2-18:6.
[146] See McKinnon Depo. 136:19-137:25.
[147] McKinnon Depo. 141:8-18. As stated by Waites, "if the planning commission recommends it then generally speaking the Council will pass it and agree with it..." Waites Depo. 52:1-4.
[148] McKinnon Depo.  133:11-137:25. See Ex. 12 "Planning Commission Recommendations for Zoning Changes Overturned by City Council Since 1990," pages CWC 02552 and CWC 02568.  Indeed, a Council Member scolded Council by asking "why should the city have a planning commission if the Council doesn't honor what they recommend?"

PDF created with pdfFactory trial version www.pdffactory.com

Further, since the Land Use Plan's first implementation in 1999, West Columbia has departed on thirteen occasions (in thirty-eight annexations) from the Plan's recommended zoning; but in <u>none</u> of those cases (other than the Hook Avenue annexation) did West Columbia impose restrictive zoning to prevent multi-family development in an undeveloped area.[149]  Most of the Council's departures from the Plan (seven) concerned minor deviations involving types of commercial and industrial uses.  Indeed, on three of these occasions, West Columbia changed the Land Use Plan to allow a *higher* density residential or commercial development when the Plan called for more *restrictive* single-family residential use.[150]  Thus, when West Columbia has departed from the Land Use Plan, it typically has been to allow *more* development, not to restrict it.  Further, in none of these cases did City Council overrule the Planning Commission. Clearly, with regard to Tanners Crossing, the West Columbia City Council departed from its own previously established criteria as reflected in the Land Use Plan, as well as its prior custom and practice of approving Planning Commission recommendations.

In similar circumstances regarding a low-income housing project, the Fifth Circuit found significant evidence of discrimination when a city deviated from a land use plan and county zoning that accommodated multifamily residences, to impose more restrictive single-family zoning. *See United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 807-810 (5th Cir. 1974)("The City's turn-about conflicted not only with its just-adopted Master Plan, but also with the county's zoning for the acreage.").  *See also Dews v. Town of Sunnyvale,* 109 F. Supp.2d at 546-47 (evidence that town violated FHA included

---

[149] West Columbia 30(b)(6) Depo. 45:1-57:8. See Ex. 2.  While the exhibit refers to 16 rather than 13 departures, in three cases the geographic area was not within the Land Use Plan at all, *see* 48:17-49:5; 53:4, and so should not be counted in this analysis.  In one of the two cases (other than the Hook Avenue annexation) where West Columbia arguably did more restrictively zone the property than called for in the Land Use Plan, there was a grandfathered existing use of television towers, so the restrictive use was not effective.  *Id.* at 53:11-54:10; 56:2-7.  The other change, the first listed in Exhibit 2, indicates a school which is in a single family home neighborhood, and so is also grandfathered in as well. (See transcript filed at Fn. 104.)

PDF created with pdfFactory trial version www.pdffactory.com

enacting zoning that did not conform with town's comprehensive plan.) Likewise, the Supreme Court has recognized that an example of suspect activity occurs when the subject property was always zoned for multifamily but is suddenly changed to single-family when a city becomes aware of a plan to erect integrated housing. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See also Fowler v. Borough of Westville*, 97 F.Supp.2d at 613 (change of zoning on subject property part of evidence sufficient to defeat city's summary judgment motion). That is precisely the case here.

2.      *West Columbia Failed to Distribute Information to the Residents on the Benefits of Annexation Before the Petition was Prepared.*

In prior annexation efforts, West Columbia had prepared and provided information summaries to potential annexation petitioners about the benefits of annexing lands into the City *before* circulation of the annexation petition.[151] In the Hook Avenue Annexation, West Columbia gathered such information, but it was not distributed until *after* the annexation petition had been prepared, signed and submitted to the City.[152] Therefore, West Columbia departed from its usual, more deliberative process of informing potential residents of the benefits of annexation in order to encourage them to endorse annexation. Based on this chronology and in light of other facts evidencing the City's departure from normal procedures, a jury could reasonably infer that West Columbia had already decided that annexation of the Hook Avenue Area was a done deal.

E.     <u>Summary of Evidence of Disparate Treatment/Discriminatory Intent.</u>

In summation, there is substantial circumstantial evidence that West Columbia acted with discriminatory intent to block Tanners Crossing. The term "undesirables" permeated the actions

---

[150] West Columbia 30(b)(6) Depo. 48:4-16. (See transcript filed at Fn. 104.)

[151] Meetze Depo. 48:24-49:19; Ex. 3; 49:22-50:10; Ex. 4; Corley Depo. 16:9-21 ("We try to provide them as much information as we can so they can make an informed decision.")

PDF created with pdfFactory trial version www.pdffactory.com

of City officials as well as the neighborhood annexation organizer. Without dispute, the nature of the project and the low-income minorities it would bring to Hook Avenue was a factor behind the sudden neighborhood resolve to annex. Further, West Columbia orchestrated the annexation and kept it secret from Connelly. West Columbia then invented a sewer capacity crisis and divined other excuses not to provide Connelly with a sewer availability letter to impede Connelly's efforts to procure Tax Credit financing. In short, *how* West Columbia acted is as important as what it did. Again, if West Columbia's motives were pure, it would not have had to move with such stealth and speed, or make misrepresentations to Connelly. With the contextual background of the statements about "undesirables" and other similar sentiments, there is substantial circumstantial evidence that an improper discriminatory intent motivated West Columbia's actions with regard to Tanners Crossing—at least sufficient to submit the FHA claim to a jury. Summary judgment should thus be denied.

## IV.     West Columbia's Actions Had A Disparate or Discriminatory Impact on Minorities.

The second method to demonstrate an FHA violation is through showing the discriminatory effect of the City's actions, using the Fourth Circuit's *Smith v. Town of Clarkton* framework. Again, Plaintiffs can show that West Columbia's actions had a discriminatory effect in two different ways: (1) disparate impact on African-Americans who are proportionately more likely to be tenants at Tanners Crossing; and (2) interference with Tanners Crossing perpetuated segregation in the Hook Avenue area. As stated in *Smith v. Town of Clarkton,* the jury must assess (1) the strength of the plaintiff's showing of discriminatory effect; (2) whether there was some evidence of discriminatory intent; (3) West Columbia's interests in blocking Tanners Crossing; and (4) whether Plaintiffs seek to compel West Columbia to affirmatively provide

---

[152] Meetze Depo. 58:1-13; Ex. 10.

PDF created with pdfFactory trial version www.pdffactory.com

housing (which would carry a higher burden), or "merely restrain" the City "from interfering with individual property owners who wished to provide such housing." 682 F.2d at 1065.

A.    West Columbia's Decisions Had a Discriminatory Impact.

As shown below, the *combined* testimony and reports of Mr. Scepaniak and Dr. Teel demonstrate that West Columbia's actions in stopping Tanners Crossing had a disparate impact upon potential black renters in the relevant market area. "These consequences are particularly distressing because, in the realm of federally assisted housing, local authorities have an obligation to further the national policy of balanced and dispersed public housing and to refrain from frustrating efforts to carry out that policy." *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 810-811 (5th Cir. 1974).

1.    *The Market Study Evidences the Demand for Tanners Crossing.*

The Market Study and Scepaniak's testimony demonstrate: (a) the relevant geographic and demographic community where likely Tanners Crossing renters would have been located; (b) that the Tanners Crossing project served a need for low-income housing in the relevant geographic area; and (c) that the Tanners Crossing project would have attracted tenants with household earnings consistent with the income ranges and racial composition identified by Dr. Teel's report. These facts distinguish cases relied on heavily by West Columbia such as *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276 (11th Cir. 2006)[153] and *Housing*

---

[153] For example, in *Hallmark,* the expert failed to establish "[w]hether a person who currently owns or rents an apartment within the price ranges proposed by Hallmark for its development would purchase or rent one of Hallmark's homes..." 466 F.3d at 1286. In contrast, in this case, the Market Study (and Dr. Teel) consider rental range, housing availability, and market absorption. Further, the plaintiff's expert in *Hallmark* did not account for an alleged glut of housing in the area. *Id*. at 1287. The Market Study here accounts for other housing, and evidences a need for low-income housing. *See* Scepaniak Depo. 48:19-49:10 (Columbia Housing Authority has 2,500 Section 8 vouchers with a waiting list of 2200; waiting list of 1700 for public housing in Greater Columbia area). (See transcript filed at fn. 16.) Finally, the plaintiff in *Hallmark* failed to establish "that Hallmark's projected price ranges may not be the price at which the homes actually sell and the apartments actually rent." *Id.* at 1288. Again, that was the very purpose of the Market Study required by SHFDA, which *does* establish housing need in such a price range.

PDF created with pdfFactory trial version www.pdffactory.com

*Investors, Inc. v. Clanton,* 68 F.Supp.2d 1287 (M.D. Ala. 1999).  In these cases, unlike here, the plaintiffs failed to present such evidence.[154]

Scepaniak has performed at least 500 Market Studies in several states, of the same type as the one he performed for SHDFA as it considered Tanners Crossing's eligibility for Tax Credits.[155]  He followed guidelines set by the State of South Carolina in providing his market analysis.[156]  The purpose of these guidelines is to ensure that market studies for SHFDA's use accurately demonstrate a need for affordable housing in the community where the proposed tax credit project will be built.

In his analysis, Scepaniak performed a site evaluation.  This consisted of a site visit and careful consideration of surrounding land uses, existing low-income rental housing in the area, and the proximity of necessary services and amenities.[157]  He then determined the market area from where Tanners Crossing would have obtained its tenants, and thereby set geographic boundaries for the likely tenant pool.[158]  Scepaniak reviewed the market area's economy and community demographic data to determine if the local economy and probable tenant mix would

---

Thus, *Hallmark,* a case that was not an appeal of the granting of summary judgment, but rather an appeal of a district court's decision as the trier of fact, is inapplicable to the facts of this case.

    Finally, in *Hallmark* the 11th Circuit departed from the 4th Circuit's *Town of Clarkton* four element analysis by adding a fifth element—the availability of other housing.  466 F.3d at 1286-1287.  Thus, *Hallmark* is inapplicable on its face in the 4th Circuit.  Further, the Tenth Circuit has not adopted the housing demand criteria established by *Hallmark,* holding that the FHA plaintiff need only establish that the protected group be actually affected by the offending governmental action.  *Reinhart v. Lincoln County,* 482 F.3d 1225, 1230-31 (10th Cir. 2007).

[154] *Housing Investors* actually supports the demographic considerations addressed by both the Market Study and Dr. Teel's report.  "The relevant group in this case is the population of low-to moderate income residents who would have been *eligible* for [the] proposed housing complex." 68 F.Supp.2d at 1299 (italics added.)  This is underscore{precisely} the group studied in by both of Connelly's experts in this case.  Thus, Plaintiffs have offered the exact type evidence required for a discriminatory impact claim by narrowly defining and focusing on the affected group.  *See Betsey v. Turtle Creek Associates*, 736 F.2d 983, 986 (4th Cir. 1984).

[155] Scepaniak Depo. 118:2-13. (See transcript filed at Fn. 16.)
[156] *Id.* at 29:7-22; 32:9-23; see Ex. 40 at fn. 19.  (See transcript filed at Fn. 16.)
[157] *Id.* at 26:1-25; 40:20-52:20.  (See transcript filed at Fn. 16.)
[158] *Id.* at 52:21-66:19; Market Study, pp. 16-17.  (See transcript filed at Fn. 16.) West Columbia has submitted no contrary evidence establishing the geographic market area.

PDF created with pdfFactory trial version www.pdffactory.com

support the Project, given the maximum income limitation to potential tenants.[159]  Finally, he performed a specific Demand Analysis for Tanners Crossing, reviewing the proposed unit mix and income limits, performing an affordability analysis, determining demand estimates and capture rates for probable tenants, and making an absorption estimate.[160]  Notably, Scepaniak determined that Tanners Crossing would "achieve 95% occupancy within 9 to 10 months."[161]

West Columbia attacks the need for Tanners Crossing and affordable housing in West Columbia generally by citing isolated testimony from Scepaniak.  However, West Columbia ignores the fundamental *reason* for the Market Study and the *impact* of its findings.  The Market Study, unlike any evidence offered by West Columbia, actually considers the stock of affordable housing for low- to moderate-income people (as established through the State of South Carolina's QAP) in the relevant geographic area.[162]  By finding that there would be a market for this housing, the Market Study establishes that there is a *need* for such housing.[163]  If there was

---

[159] *Id.* at 71:9-106:21; Market Study, pp. 18-34. (See transcript filed at Fn. 16.)  West Columbia has submitted no such evidence.

[160] *Id.*, Market Study, pp. 37-57. (See transcript filed at Fn. 16.) West Columbia had performed no such study or analysis.

[161] *Id.* at 104:20-106:3; Market Study, page 44. (See transcript filed at Fn. 16.)  West Columbia has submitted no evidence contradicting this conclusion.

[162] Scepaniak Depo. 106:22-114:18; Market Study at pages 49-57 where Scepaniak analyzes 21 current rental communities in the market area. (See transcript filed at Fn. 16.)

[163] West Columbia offers rental housing numbers without regard to geography or affordability as its "evidence" that there was sufficient affordable housing in the area.  Apparently, West Columbia has no concern for any threshold minimally adequate *quality* of housing available to its citizens as it does not take that into consideration.  The quality of available housing is properly to be considered as part of the housing "picture" considered by a court in a FHA analysis.  *See Town of Clarkton,* 682 F.2d at 1065; *Atkins v. Robinson*, 545 F.Supp. 852, 867-88 (E.D. Va. 1982), *aff'd* 733 F.2d 318 (4th Cir. 1984).  For example, in *Town of Clarkton*, the housing to be built was "new construction to replace substandard housing."  682 F.2d at 1065.  West Columbia makes no attempt to explore if any of the available housing stock is "safe and decent" housing as opposed to properties like the old and slum-like Gentle Pines development.  On the other hand, Scepaniak's Market Study specifically studied the available rental housing and found that two of the reasons Tanners Crossing would be successful were (1) "the age and condition of the existing rent stock;" (2) the other rental communities "in the primary market area are more than 15 years old and show signs of deferred maintenance;"  and finally (3) [a]s a result of their age, much [of] the multi-family rental stock in the primary [market area] is outdated and some show signs of deferred maintenance."  Scepaniak Depo. 93:9-94:8; 95:10-101:23; *see* Market Study, pages 60, 49.  The Market Study concluded that 415 West Columbians were living in substandard conditions as defined by the QAP.  Scepaniak Depo. 98:19-23. (See transcript filed at Fn. 16.)  Simply put, the unsupported assertion by West Columbia that there is adequate rental housing within its borders is wrong and misleading.

PDF created with pdfFactory trial version www.pdffactory.com

no demand for the low-income housing that Tanners Crossing would have supplied, the Market Study would have concluded that the Project was not eligible for Tax Credits. Thus, the State of South Carolina concluded that Tanners Crossing was needed in this area of West Columbia. West Columbia's arguments to the contrary are just that—arguments. This is a matter of factual debate, and there is enough evidence provided by Scepaniak's testimony and his Market Study to defeat the City's summary judgment motion.

The City's motion concentrates on the existing rental stock in the greater Columbia area. However, even assuming its evidence of rental housing supply is admissible, correct, and relevant, it does nothing to undermine the Market Study's ultimate conclusion: that Tanners Crossing would have successfully achieved almost maximum occupancy from the targeted income group in the market area in under a year. *Hallmark,* the 11th Circuit case that the City cites as its chief authority, did not consider anything close to Scepaniak's Markey Study.[164] Connelly does not baldly assert, as did the *Hallmark* developer, that the FHA provides a right for "increased housing choices and supply." 466 F.3d at 1288. Here, the Market Study conclusively demonstrates that notwithstanding *any* supply of housing, Tanners Crossing would have rented-out to the relevant community.[165]

By placing such heavy reliance on *Hallmark,* West Columbia's argument must be that as long as there is *any* available rental stock *anywhere* in the greater Columbia area, then it cannot be guilty of an FHA discriminatory impact violation. That turns the FHA on its head. In

---

[164] Indeed, the key point for the district and circuit courts in *Hallmark* was that there was **no** such tie in between the overall demographic information presented and absorption of the project: "[w]hether a person who currently owns a home or rents an apartment within the price ranges proposed by Hallmark for its development would purchase or rent one of Hallmark's homes is speculative." 466 F.3d at 1286.

[165] A member of the West Columbia Planning Commission asked if the Tanners Crossing project was to be subsidized by the government, because, he said, "there wasn't any other government subsidized housing in that area." Buchanan Depo. 35:19-36:3. Thus, there is additional support in the record not considered by Scepaniak.

virtually any case, there will surely be some evidence of alternative housing other than that which would have been provided by the plaintiff's project. But what occurred in *Hallmark* is more an evidentiary matter; the district court, sitting *as the trier of fact*, found that the plaintiff's expert's testimony was not credible because he did not account for the impact of other available housing. 466 F.3d 1286-1288. (In stark contrast, Scepaniak's analysis *did* consider housing supply and concluded there was a market demand in West Columbia for Tanners Crossing.) Thus, there is no *per se* rule from *Hallmark* that other available housing is fatal to an FHA claim against a municipality. It is merely a factual matter to be decided by the jury in evaluating competing testimony.

Therefore, in light of Scepaniak's testimony and the Market Study he prepared (using South Carolina standards), there is substantial evidence that Tanners Crossing would have attracted an identified market of renters below an income threshold within a defined geographic area. The only evidence needed at this point to show discriminatory impact is that there was a disparate impact on African-Americans when West Columbia killed the project. As discussed below, that is precisely what Dr. Teel's report shows.

2.    *Dr. Teel Found a Substantial, Statistically Significant Impact.*

The testimony and report of Dr. Jess Teel establishes the connection between Scepaniak's conclusions and racially disparate impact. West Columbia alleges that Dr. Teel's conclusions do not show that its interference with Tanners Crossing had a "statistically significant impact" on minorities. However, West Columbia offers no competing statistical studies, or critique of Teel's methodology. Its Motion therefore resorts to unfounded assertions that Teel's opinion is biased or based on improper assumptions. At best, the City's motion thus raises a credibility issue for cross-examination at trial.

PDF created with pdfFactory trial version www.pdffactory.com

Teel relied upon the Market Study, his own study of likely tenants, and Census data[166] for his research. Teel did not just rely on the market area as determined by Scepaniak. He also tested his results in three larger geographic areas to include certain Census tracts only in Lexington County, all of Lexington County, and all of Richland County.[167]

Teel conducted sixteen initial statistical tests where he compared the proportion of African-American renter households to comparable white renter households.[168] He reviewed pertinent information in the different geographic areas; for example, he noted that in the Market Study area, 77.06% of the African-Americans were renters while only 39.47% of the whites were renters;[169] that white households in this area has a $37,083 median household income while African-American households in this area had only a $22,500 median household income;[170] and 23.90% of the African-American households were below the poverty line as compared to 10.72% of white households.[171]

Finally, Teel compared the proportion of African-American renter households in these three geographic areas who had incomes of less than $35,000 per year (the consumer base from which the Project would actually have drawn tenants) to the proportion of white renter households in these same areas.[172] He then followed a statistical hypothetical called a "null hypothesis" to test his conclusions.[173] The statistical analysis revealed that in every geographic

---

[166] It is proper to use census data when making demographic studies in FHA cases. *See e.g. Smith v. Town of Clarkton,* 682 F.2d at 1060, fn. 3 (4th Cir. cited population and census data.). "The use of census data is an appropriate method of demonstrating discrimination. The defendant would require refinements beyond that available in published statistics. A perfect statistical model is not required." *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653 (5th Cir. 1983).

[167] Teel Depo. 50:5-52:20; Report pp. 10-16. (See transcript filed at Fn. 12.)
[168] Teel Report, pp.18-19. (See transcript filed at Fn. 12.)
[169] Teel Report, pp. 14, 27. (See transcript filed at Fn. 12.)
[170] Teel Report, pp. 13, 20. (See transcript filed at Fn. 12.)
[171] Teel Report, pp. 14, 21. (See transcript filed at Fn. 12.)
[172] Teel Report, p.12. (See transcript filed at Fn. 12.)
[173] Teel Report, pp. 12-13. (See transcript filed at Fn. 12.)

PDF created with pdfFactory trial version www.pdffactory.com

area tested, and in several different groups, the segment of African-Americans was disproportionately affected as compared to the proportion of whites.[174]

Based on the statistical disparity between the racial composition and proportions of the racial composition of the likely tenants for Tanners Crossing, Teel concluded that that West Columbia's actions "had a statically significant disproportionate adverse and hence discriminatory impact upon Black/African American extremely low- to low-rental households relative to White extremely low- to low-income rental households in the relevant geographic market area."[175]  Using statistical guidelines as applied to the Market Study and other relevant geographic areas, Dr. Teel using renters as a narrowly defined affected group found his conclusion of disparate racial impact was supported by a standard deviation of 9.68, meaning that there was less than one-one-hundredth of a percent likelihood of his conclusion occurring by chance.[176]  This evidence creates an inference of discrimination with sufficient scientific certainty for Plaintiffs to meet their burden of disparate impact.

This burden is met because the standard deviation found by Teel falls well above the acceptable ranges of such data required by the Fourth Circuit: "[W]e now hold that, in all cases involving racial discrimination, the courts of this circuit must apply a standard deviation analysis such as that approved by the Supreme Court in *Hazelwood* before drawing conclusions from statistical comparisons."  *Moultrie v. Martin*, 690 F.2d 1078, 1082 (4th Cir. 1982).

> [S]tatisticians compare figures through an objective process known as hypothesis testing. ... One of the principal reasons for using a standard deviation analysis and hypothesis testing is that it is axiomatic in a statistical analysis that the precision and dependability of statistics is directly related to the size of the sample being evaluated.  Without the use of hypothesis testing, a court may give weight to statistical differences which are actually mathematically insignificant.  Such a situation often arises when the sample sizes are relatively small.  For this reason,

---

[174] Teel Report, pp. 18-19. (See transcript filed at Fn. 12.)
[175] Teel Report, p. 10.   (See transcript filed at Fn. 12.)
[176] Teel Report, p. 16. (See transcript filed at Fn. 12.)

PDF created with pdfFactory trial version www.pdffactory.com

it is particularly important that courts follow such formulae before drawing conclusions from statistical evidence, and we so require it.

*Id.* at 1082-83 (citations omitted.)  In a later case, the Fourth Circuit further explained its view of

statistical evidence in discrimination cases:

> [S]tandard deviation analysis ... tests the hypothesis that underrepresentation of a protected minority group in any sample made up of a protected and a nonprotected group (binomial distribution) might be attributable to normal fluctuations of chance rather than to discriminatory design. The "standard deviation" is the measure of the predictable fluctuation in a random selection process. ….. As standard deviations increase numerically, the probability of chance as the cause of revealed underrepresentation of course diminishes. *To the extent the probability of chance is shown to be quite small, the legal inference of discrimination based upon a rough legal assessment that disparities are manifestly "gross" or "substantial" is thus "scientifically" confirmed.*

*Equal Employment Opportunity Com'n. v. American National Bank*, 652 F.2d 1176, 1191 (4th

Cir. 1981)(italics added).   The Court went on to state:

> If a legal rule of analysis can properly be derived from the *Castaneda* footnote, it can only be that standard deviations greater than two or three necessarily exclude chance as a cause of underrepresentation. The converse of this that standard deviations of not "more than two or three" necessarily exclude discriminatory design as the cause is nowhere implied. Nor could it be, as we shall now attempt to show.
> 
> ....
> 
> [M]ost social scientists, applying laboratory rigor to rule out chance as even a theoretical possibility rather than the law's rougher gauge of the "preponderance of the evidence," are prepared to discard chance as an hypothesis when its probability level is no more than 5%, *i.e.,* at approximately two standard deviations.
> 
> ....
> 
> From all this we conclude that courts of law should be extremely cautious in drawing any conclusions from standard deviations in the range of one to three. Above this range, with standard deviations of more than three, the analysis may perhaps safely be used absolutely to exclude chance as a hypothesis, hence absolutely to confirm the legitimacy of an inference of discrimination based upon judicial appraisals that disparities are, to the legally trained eye, "gross."

*Id.* at 1192-93 (citations omitted.)

PDF created with pdfFactory trial version www.pdffactory.com

As stated, Dr. Teel has found nearly ten standard deviations, a *very strong* statistical showing that is far greater than the Fourth Circuit's minimum threshold of "two to three" standard deviations. Because West Columbia has not challenged Dr. Teel's statistical model, it is uncontradicted that its actions had a substantial statistically significant disproportionate effect upon African-Americans.

3.    *Dr. Teel Properly Used Actual Tenancy Income Ranges Rather than Targeted Ones.*

West Columbia claims that Teel's conclusions were modified to include a larger group of eligible tenants because the target group for the Market Study did not provide the desired statistical effect. However, Teel's analysis was modified to tailor the focus group from *all residents* (which included renters *and* owners) to the most narrowly focused group possible of *only* black and white prospective *renters*.[177]   Some FHA cases have allowed the statistical analysis to consider the racial composition of the entire community as opposed to the persons who were most likely to be renters, *See e.g., Town of Clarkton, supra* (court looked at entire county); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 929 (2nd Cir. 1988)(court focused on statistics for entire town); *Halet v. Wend Inv. Co*., 672 F.2d 1305, (9th Cir. 1982)(court focused on minority heads of households in Los Angeles). However, Plaintiffs decided to use the narrowest group possible—that is, only renters and not simply residents—to adduce a more exact and compelling showing of disparate impact. Thus, Dr. Teel's final report compared only African-American *renters* to White *renters*. Notably, using the income ranges defined by the Market Study, Teel would still have found a standard deviation in excess of

---

[177] See Defendant's Exhibits 33 and 34 filed in support of Defendant's Motion for Summary Judgment.

PDF created with pdfFactory trial version www.pdffactory.com

three,[178] which still meets the Fourth Circuit's statistical requirements. Therefore, Plaintiffs have provided sufficient evidence of disparate impact under all of Teel's conclusions.

West Columbia also attacks Teel's conclusions based on his use of a wider income range than originally targeted by the Project. While the minimum income level of Tanners Crossing was in the $20,000 range, and the Market Study considered that minimum range, this income range was only a *target*. The target ranges use national affordability figures that individuals should not devote more than 35% of their family income for rent.[179] However, for Tanners Crossing, there was no actual minimum qualifying income (although there was a maximum), because many tenants of lower incomes use multiple forms of housing support, such as Section 8 vouchers. In other words, tenants with household incomes below $20,000 could have nonetheless been eligible to obtain housing at Tanners Crossing, considering other forms of government subsidization. Indeed, in other low-income developments built by Connelly, the income range of actual tenant flow dipped well below that target minimum.[180]

Further, the increase in the number of eligible tenants in Dr. Teel's study does not compromise the conclusions of the Market Study (which, in ay event, was based on standards established by the State of South Carolina, and completed by an analyst approved by the State), which was based on the minimum income range of $20,000. Dr. Teel's conclusion shows greater demand for apartments in Tanners Crossing, because the pool of potential applicants

---

[178] See Defendant's Exhibit 33, pp. 8 and 9 respectively of two draft Teel reports. (Docket Entry 117-2, pp. 9 & 37.)

[179] Scepaniak Depo. 83:6-11; (See transcript filed at Fn. 16.) Teel Report, pp. 8-10. (See transcript filed at Fn. 12.)

[180] Teel Report pp.8-10; (See transcript filed at Fn. 12.) Connelly 8/30/07 Declaration ¶¶6, 7 (at fn. 39); Scepaniak Depo. 10:15-11:3; 13:2-18. (See transcript filed at Fn. 16.) West Columbia, relying on Minutes of its April 13, 2004 meeting claims that Connelly represented that applicants with insufficient income would be rejected. West Columbia Memo, p. 17. This statement is not accurate in context, as the discussion took place while Connelly was being cross-examined by Councilmember Harmon about the project being 'subsidized.' As noted by Connelly's materials presented to City Council, the resident's profile was targeted to be between *50% and 60%* of the area median income, which for Lexington County was between $30,300 and $36,360. Connelly 8/30/06 Declaration ¶7.

PDF created with pdfFactory trial version www.pdffactory.com

(with incomes below $20,000) would obviously increase; as Scepaniak stated, his analysis was "the most conservative approach."[181]     Because of South Carolina's narrowly prescribed methodology for the Market Study, all people qualified to live in the project are not considered in the analysis.[182]  Thus, Teel's conclusion in no way detracts from Scepaniak's conclusions.  In fact, Teel's conclusions adjust more for the reality of the usual tenant base for Tax Credit projects like Tanners Crossing, *improving* the reliability of the Market Study analysis.

West Columbia's charge that Dr. Teel changed the information considered to alter the result of his study might be a proper basis for cross-examination at trial.  However, it is not a basis for the Court to ignore such probative evidence at this summary judgment stage.

### 4.     *Plaintiffs Need Only Show Eligible Tenants, not Actual Applicants.*

West Columbia argues that Plaintiffs have not provided evidence that, had Tanners Crossing been built, African-Americans in the proportions stated in Dr. Teel's analysis would have actually lived there.  West Columbia is incorrect in its characterization of the type of evidence properly used to support this type of FHA claim.

In *Town of Clarkton*, the statistics accepted by the Fourth Circuit to show discriminatory impact of the denial of a public housing project were that "[a]lthough blacks make up less than 40% of the total county population, 56% of all poverty-level families in the county are black, and 69.2% of all black families in [the county] are presumptively eligible for low income housing, while only 26% of the white population is so qualified."  682 F.2d at 1061.  "The undisputed statistical picture leaves no doubt that the black population of [the county] was adversely

---

See Defendant's Exhibit 15a, page WC00953.  Further, the minutes do reflect the true tenor of Connelly's statement, as there are other sources for income to make rent payments than earned income.  Connelly 8/30/06 Declaration ¶7.
[181] Scepaniak Depo. 83:16-84:12. Using the methodology used by Scepaniak in the Market Study, an increase in the eligible market of renters to include Teel's data for projected actual tenants as opposed to targeted tenants would conform to this result.  *See generally*, Scepaniak Depo. 85:17-104:22. (See transcript filed at Fn. 16.)
[182] Scepaniak Depo. 92:10-93:13. (See transcript filed at Fn. 16.)

PDF created with pdfFactory trial version www.pdffactory.com

affected by the termination of the housing project, as it is that population most in need of new construction to replace substandard housing, and it is the one with the highest percentage of presumptively eligible applicants." *Id.* at 1065.

Thus, *Town of Clarkton* did not require exact surveys of the racial composition of the persons who had applied to be tenants of the doomed project. It is enough for the statistical data to bear out the *likely* racial composition of this group, which is precisely what Dr. Teel's report does. Citing *Hazelwood School District v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Fourth Circuit stated in *United States v. Gregory*, 871 F.2d 1239, 1244-1245 (4th Cir. 1989), that "[t]he Supreme Court clearly did not require that such information be obtained for the statistical evidence to be significant and outrightly rejected petitioner's argument that it was required." In doing so, the Fourth Circuit reversed the district court's determination that actual applicant data was needed to establish statistical evidence of Title VII violation. *Id.*

For the same reason, West Columbia's argument that Teel's report does not adequately identify who would actually live in Tanners Crossing must be rejected. The FHA does not require Plaintiffs to provide more precise evidence than the eligible pool of tenants for Tanners Crossing. Thus, Dr. Teel's testimony, in conjunction with the Market Study, establishes the necessary connection between the need for Tanners Crossing and the discriminatory effect upon African-Americans resulting from West Columbia's interference with the project.

B.    The City's Own Evidence Demonstrates a Perpetuation of Segregation.

As stated *supra*, there is a second, independent method to prove discriminatory effect, aside from a disparate impact on minorities. A facially neutral decision about housing can also affect the "entire community involved." *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 987

PDF created with pdfFactory trial version www.pdffactory.com

n.3 (4th Cir. 1984). "For example, if a policy perpetuates segregation and thereby prevents interracial association, it will be considered invidious under the Fair Housing Act notwithstanding the fact that it may have no immediate impact." *Id*.

As Dr. Teel's report shows, a significantly larger proportion of black renters as compared to white renters were negatively affected by West Columbia's interference with Tanners Crossing. Thus, Tanners Crossing would have increased the minority population in the Hook Avenue neighborhood.

The U.S. Census tract containing the Hook Avenue neighborhood has one of the lowest minority populations of any census tract in West Columbia, with a minority population of 0 to 25%.[183] By the admission of many of the Hook Avenue area residents, it is a mostly white area.[184] Other areas of West Columbia have much higher minority concentrations.[185]

West Columbia also has offered twenty-one alternative areas that it considers appropriate for multi-family housing.[186] However, of these twenty-one potential locations, ten are located within census tracts that have the City's higher concentration of minorities[187] and six more are located within a block or two of the City's higher minority concentrations.[188] Only five are located more than a few blocks away from the larger minority populations in West Columbia, and of these, only two are more than a few blocks away from minority population tracts, and none are as far from the minority populated areas as the Property.[189] Finally, there is no

---

[183] See Shuler Depo. 29:3-32:2; Ex. 3.
[184] Geer Depo. 40:2-17; 41:1-15; Lynch Depo. 61:23-62:2.
[185] See Ex. 3 at fn. 183.
[186] See West Columbia 30(b)(6) Depo. 59:3-67:4; Ex. 3, 4. (See transcript filed at Fn. 104.) As noted in the testimony, location no. 13 was not annexed into West Columbia until after 2004, so it was not a West Columbia area "available" for multi-family housing in 2004. Also, there is no evidence that any of these locations (except perhaps one) were actually available to be developed at the time.
[187] See Connelly 8/30/07 Declaration ¶8; Exhibit B. (at fn. 39) There are identified as nos. 4, 5, 6, 7, 8, 9, 11, 12, 21, and 22.
[188] *Id*. These are identified as nos. 2, 3, 10, 16, 17 and 20.
[189] *Id*. These are identified as nos. 1, 14, 15, 18 and 19.

PDF created with pdfFactory trial version www.pdffactory.com

evidence that any of these properties suggested as alternative sites by West Columbia were even available for sale in mid-2004, so there is no evidence that these locations truly are alternatives.

This is not surprising given West Columbia's attitude: as explained by one Council Member, he felt that the area behind the (predominantly African-American) Brookland Baptist Church, or the area where the aforementioned Gentle Pines housing complex is located, would have been "appropriate" places for Tanners Crossing.[190] As West Columbia admitted, only 19.7% of its overall population is comprised of minorities.[191] It is thus inferable from the geographically concentrated minority populations within or near the alternative locations it offered, that West Columbia's other suggested sites would continue to perpetuate segregation in the City.

West Columbia's own evidence proves that it overwhelmingly prefers a multi-family housing project in or near areas where the largest minority populations are already clustered. Thus, Plaintiffs have submitted evidence that West Columbia's actions perpetuated segregation of the Hook Avenue neighborhood.

## V. West Columbia's Suggested Legitimate Reasons are Pretextual.

### A. Alternative Standards of Proof.

#### 1. The _Town of Clarkton_ Standard

In _Betsey v. Turtle Creek Associates,_ the Fourth Circuit explained that when the defendant in a FHA case is a governmental entity, there is _no_ burden shifting as provided by _McDonnell Douglas v. Green,_ 411 U.S. 792 (1973) in private FHA claims. 736 F.2d at 988, n. 5. Instead, Plaintiffs need only meet the four part _Town of Clarkton_ test. _Id_. This is sensible. The third element of the _Town of Clarkton_ standard requires proof of "the defendant's interest in

---

[190] Harley Depo. 38:5-39:16.

PDF created with pdfFactory trial version www.pdffactory.com

taking the action complained of," which from a plaintiff's perspective must mean evidence that the defendant municipality did not really have such an interest, or that such interest was minimal. As noted in *Betsey*, "[o]bviously, a business necessity test is inapplicable in situations where the defendant is a public entity." 736 F.2d at 988, n.5. This comment would negate the burden shifting required by *McDonnell Douglas*, in the context of an FHA claim against a governmental entity.

Although in the Fourth Circuit, Plaintiffs may have the burden of proving the defendant's interest in taking the action complained of, the Plaintiffs need only prove that West Columbia did not have a *compelling* governmental interest. "Once the existence of a racially discriminatory effect is thus proven, the City must bear the heavy burden of demonstrating that its refusal, and resulting discrimination, were necessary to promote a compelling governmental interest." *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 809 (5th Cir. 1974). *See also City of Black Jack*, 508 F.2d at 1188, n.4 (once plaintiff in FHA case establishes "a *prima facie* case of racial discrimination, it became proper to apply the compelling governmental interest requirement of the equal protection cases.")

Regardless, because evidence of discriminatory intent is a factor (albeit a minor one) in a discriminatory effect case, the discussion of Plaintiffs' evidence of pretext *infra* assists in establishing evidence of discriminatory intent. Further, this evidence of pretext proves that West Columbia did not have a legitimate "interest in taking the action complained of," under the *Town of Clarkton* standard.

2. *The McDonnell Douglas Burden Shifting.*

Should the Court's analysis not end with the four elements from *Town of Clarkton*, Plaintiffs also meet an alternative approach adopted in some other circuits.

---

[191] *See* West Columbia Memo, p. 3.

PDF created with pdfFactory trial version www.pdffactory.com

In the Fourth Circuit, in a FHA lawsuit against a *non-governmental* defendant, the defendant may overcome a *prima facie* showing of discriminatory effect if it can articulate a "legitimate, non-discriminatory reason for the challenged practice." *Betsey v. Turtle Creek Associates,* 736 F.2d 983, 988 (4th Cir. 1984)("The burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent"), *citing McDonnell Douglas v. Green,* 411 U.S. 792 (1973).

Several Circuits have apparently disagreed with *Town of Clarkton* and held that when the defendant is a governmental entity in a FHA case, the burden shifts to the defendant after the plaintiff establishes its *prima facie* case of discrimination. *See, e.g., Sanghvi v. City of Claremont*, 328 F.3d 532 (9th Cir. 2003) (applying the *McDonnell Douglas* framework in an FHA action by property owners who alleged discrimination against their facility's Alzheimer's patients); *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35 (2nd Cir. 2001) (applying *McDonnell Douglas* framework in an FHA action involving denial of special use permits for rehabilitation halfway houses); *Boykin v. Bank of America Corp.*, 162 Fed. Appx. 837, 2005 WL 3479878, 2005 U.S. App. LEXIS 28415 (11th Cir. 2005) (applying *McDonnell Douglas prima facie* elements to an alleged discriminatory loan practice); *Koorn v. Lacey Twp.*, 78 Fed. Appx. 199, 207, 2003 WL 22366923 (3d Cir. 2003) (analyzing petitioners' FHA claims under the *McDonnell Douglas* framework).[192]

---

[192] Notably, the *McDonnell Douglas* analysis is an *alternative* one. In *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310 (4th Cir. 2005), the Fourth Circuit addressed the role of *McDonnell Douglas* in an appeal of summary judgment as follows:

> [A] Title VII plaintiff may "avert summary judgment… through two avenues of proof." A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision…. Alternatively, a plaintiff may "proceed under [the *McDonnell Douglas*] 'pretext' framework, under which the employee, after establishing a *prima*

PDF created with pdfFactory trial version www.pdffactory.com

Under *McDonnell Douglas*, assuming that West Columbia can actually proffer "legitimate" and "non-discriminatory" reasons for both its refusal to provide a sewer letter and the annexation and restrictive zoning of the Property, Plaintiffs are entitled to show that West Columbia's actions were mere pretext. Plaintiffs "must… be afforded a fair opportunity to show that [the]… reason for rejection was in fact pretext…. [*i.e.*,] that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." 411 U.S. at 804-05. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1982), adds an important clarification to the *McDonnell Douglas* analysis. The Court, once more addressing a Title VII action, stated that "when the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case and responds to plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the ***factfinder*** must then decide whether the rejection was discriminatory." *Id*. at 714-15. (emphasis supplied.)  "A plaintiff's *prima facie* case, combined with sufficient evidence to find that the [defendant's] asserted justification is false, may permit *the trier of fact* to conclude that the [defendant] unlawfully discriminated." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350-51 (5th Cir. 2005)(internal quotations omitted; emphasis supplied.)

Courts have found pretext evidence in FHA cases sufficient for plaintiffs to withstand summary judgment in analogous circumstances.  In *Regional Economic Comty. Action Program,*

---

*facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination."

*Id.* at 318 (internal citations omitted), *quoting Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc). This language from *Diamond* indicates the Fourth Circuit entertains *either* a traditional *prima facie* showing of discrimination *or* a *McDonnell Douglas*' burden-shifting framework.  Thus, because Plaintiffs have provided evidence that race was a factor that motivated West Columbia's actions as part of the discriminatory intent claim, ultimately proving pretext is not necessary. *See* Section III, *supra*.  Nonetheless, for the discriminatory effect claim, Plaintiffs have sufficient evidence of such pretext to rebut West Columbia's showing as demonstrated *infra*.

PDF created with pdfFactory trial version www.pdffactory.com

*Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) (hereinafter "*RECAP*"), the Second Circuit held that plaintiffs had shown sufficient evidence of pretext to raise a genuine issue of material fact justifying a remand. In beginning its analysis of plaintiff's claim that defendant town had denied a special-use permit for a halfway house in violation of FHA provisions, the court noted that "[t]he plaintiffs rely on three categories of evidence: (1) the granting of a special-use permit for [another property], (2) deposition testimony, and (3) a map of the surrounding area." *Id.* at 51. In addition to statements made by members of the City's government regarding RECAP's permit application, the court concluded that "the record on appeal indicates that at a minimum… this evidence casts doubt on the defendant's proffered reasons for denying RECAP a special-use permit." *Id.*

Addressing each portion of plaintiff's evidence separately, the court noted that denial of plaintiff's application, while granting another similar permit within the same general time frame, created an inference of pretext (just like the City of West Columbia's granting sewer access to the Jenni Lynn Facility with a representation of "ample" sewer capacity). *See id.* Secondly, the *RECAP* court rejected defendant's asserted justification that residents of the halfway house would be disturbed by a train passing in close proximity because the same tracks passed by other permitted property that would serve as a childcare facility (parallel to the City of West Columbia's lack-of-capacity argument—again, the Jenni Lynn Facility received sewer service). *Id.* at 52. Finally, the court found merit in plaintiff's map of the area, which refuted defendant's contention that it wished to maintain the neighborhood surrounding plaintiff's property for industrial uses (similar to West Columbia's claim that Tanners Crossing was inconsistent with other surrounding uses, even though multi-family housing already existed already on the adjacent property and an industrial property was behind the Tanners Crossing site). *Id. See also*

PDF created with pdfFactory trial version www.pdffactory.com

*Avalonbay Cmtys., Inc. v. Town of Orange*, 775 A.2d 284 (Conn. 2001) (finding pretext in state court action when defendant contended it wanted to preserve industrial zoning for a particular area, even though area had traditionally displayed mixed use characteristics).

Similarly, in *Reynolds v. Quarter Circle Ranch, Inc.*, 280 F. Supp.2d 1235 (D. Colo. 2003), the court denied defendant's motion for summary judgment because the plaintiffs had "introduced several facts that might establish pretext." *Id.* at 1245. Among other evidence that inferred discriminatory action, the court recognized that defendants had approved several architectural plan applications for other projects while rejecting the plaintiff's similar plans. *Id.* at 1246. Likewise here, the City approved other development projects that would burden sewer capacity in the same area of Tanners Crossing. This is sufficient evidence to overcome defendant's motion for summary judgment.

*Kennedy Park Homes Assn. v. City of Lackawanna*, 318 F. Supp. 669 (W.D.N.Y. 1970), *aff'd. by* 436 F.2d 108 (2d Cir. 1970), directly addressed a pretextual sewer capacity issue. There, the court determined that a city's asserted reason of insufficient sewer capacity for denying certain clearances to build a low-income housing project was pretextual, and supported a finding of FHA liability. The court cited the fact that the city claimed a "sewer crisis" without actually studying its capacity problems (even though funds had been allocated for such a study several years prior) as one basis for its pretext finding. *Id.* at 678. Additionally, the court supported its finding of pretext on the following factors: (a) the city granted sewer access to a baseball stadium that presumably would have caused similar (or greater) capacity burdens as the proposed housing project (same as the Jenni Lynn Facility in this case); and (b) discussions of the so-called "sewer crisis" did not take place until after rumors began to circulate regarding the building of a housing project in the area, creating inference of discrimination (same as this case,

PDF created with pdfFactory trial version www.pdffactory.com

where the capacity issue was not raised until three months after Connelly requested the sewer letter). *Id.* at 693, 695. Such factors once again provide a potent analogy to the City of West Columbia's claimed lack of sewer capacity while granting certification to other projects in the same area as Tanners Crossing. Moreover, as discussed below, a finding of pretext is bolstered here in light of substantial circumstantial evidence that there was "ample" sewer capacity to accommodate Tanners Crossing.

B.    <u>The "Sewer Capacity" Issue was Pure Fiction.</u>

1.    *West Columbia Certified to DHEC that it had "Ample Sewer Capacity," Nearly Contemporaneously to the Time it Told Connelly it Lacked Sewer Capacity for Tanners Crossing.*

On June 17, 2004, Joe Owens, the City's Director of Utilities, certified in a letter to SCDHEC that West Columbia had "**ample sewer capacity**" to serve an expansion of the Jenni Lynn Facility (emphasis added).[193] He also certified that West Columbia had "ample sewer capacity" to serve a single-family residential subdivision on June 13, 2004.[194] "Ample" is defined as "large in degree or kind; in abundant measure" and "more than enough." *The American Heritage Dictionary* (2nd College Ed. 1982). Such contemporaneous representations that West Columbia had abundant sewer capacity directly contradict its assertions that there was insufficient capacity to service Tanners Crossing.

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the [defendant] is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the

---

[193] Owens Depo. 68:12-69:17. See Ex. 112.
[194] Owens Depo. 66:25-67:14. See Ex. 110.

PDF created with pdfFactory trial version www.pdffactory.com

employer unlawfully discriminated." *Id.* at 148. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks,* 509 U.S.502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Charleston Hous. Auth. v. United States Dept. of Agric.*, 419 F.3d 729, 741-42 (8th Cir. 2005)(lack of evidence supporting defendant's asserted justifications demonstrated that the justifications were pretextual in FHA case.)

        2.     *West Columbia Had Known of Such Potential Capacity Issues for Years.*

For over a decade prior to June 2004, West Columbia was aware of an alleged "capacity" problem.[195] Although a small overflow in West Columbia's sewer system occurred sometime in the summer of 2004, West Columbia took no specific steps other than monitoring the one manhole where an overflow occurred.[196] Indeed, it was considered a problem for the City of *Columbia*, not West Columbia.[197] West Columbia never stopped a development of any type (other than Tanners Crossing) or declared a moratorium on development due to such a capacity issue.[198] Significantly, the City admits that, prior to annexing the Hook Avenue area, it conducted no studies to determine the annexation's impact on sewer infrastructure.[199] If West Columbia was truly worried about a capacity problem, that issue certainly would have surfaced with other residential and commercial development plans, and the City would have taken *some* meaningful responsive measures. But the problem never came up in the context of other

---

[195] Cunningham Depo. 46:17-25; Connelly 1/18/06 Declaration ¶¶48, 49.
[196] Varn Depo. 40:22-42:15. The overflow was so insignificant that no written records documenting it were created. Varn Depo. 83:2-11.
[197] *Id.*
[198] Harley Depo. 34:16-25.
[199] West Columbia 30(b)(6) Depo. 58:10-15. (See transcript filed at Fn. 104.)

PDF created with pdfFactory trial version www.pdffactory.com

development and the City never acted to correct its putative sewer problem—except when it considered Tanners Crossing.

3.    *The Sewer Capacity Issue was not Originally Mentioned by West Columbia.*

Connelly requested a sewer service letter from West Columbia as early as February 2004[200]. But it waited to reveal a potential capacity issue for about five months, at a June 1, 2004 meeting between Connelly and the City's attorney, which itself occurred one month after rejection of the initial rezoning at May 4, 2004 City Council meeting.[201]

Pretext may be inferred when the defendant provides an explanation late in the process. *EEOC v. Sears, Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)("a factfinder could infer from the late appearance of [the defendant's] current justification that it is a post-hoc rationale, not a legitimate explanation for its decision..."); *Atkins v. Robinson*, 545 F.Supp. at 879 ("[t]he Court has determined that this argument is largely an after-the-fact rationalization and is largely pretextual.")

4.    *West Columbia Has* <u>*Never*</u> *Denied Sewer to* <u>*Anyone*</u> *Else Because of Sewer Capacity.*

Before Tanners Crossing, West Columbia had *never* told *any* business or individual that it might not be able to provide sewer service due to capacity issues.[202] There is no evidence that West Columbia has ever actually denied sewer service to any residence or business because of a sewer capacity problem.

---

[200] See Section V.D.1., *infra*.
[201] Connelly Depo. 145:6-12; 151:20-154:1. (See transcript filed at Fn. 107.)
[202] West Columbia 30(b)(6) Depo. 34:21-35:3. (See transcript filed at Fn. 104.)

PDF created with pdfFactory trial version www.pdffactory.com

5.     *West Columbia's Reasons for not Signing the Sewer Letter are Post-Hoc.*

In its litigating papers, West Columbia has identified several reasons why it did not provide the sewer letter to Connelly.[203]  However, at the time the issue arose, West Columbia identified none of these reasons.  No one associated with Connelly heard of a potential sewer capacity issue until shortly before the June 1, 2004 City Council meeting.[204]  At that meeting, when capacity was first officially raised, West Columbia offered no other reason to justify not providing the sewer letter.[205]  Accordingly, it is reasonable to infer that, as this suit progressed, West Columbia realized that substantial evidence of the falsity of its "sewer capacity" defense existed.  After the fact, it has now changed its tune to grasp at larger policy issues to excuse it decision to deny Connelly the sewer letter.  However, when such justifications are post-hoc, that timing in and of itself is evidence of pretext.  *See EEOC v. Sears, Roebuck & Co, supra.*

C.     West Columbia has Offered Water and Sewer Service to Non-Residents Without
       Requiring Annexation.

1.     *The City Provided Water and Sewer to the Jenni-Lynn Nursing Home and Other
       Entities Outside of its Borders.*

West Columbia admits that if a development outside of its borders satisfies "all city requirements, adheres to all city polic[ies], and meets the goals and objectives of the comprehensive plan," there was no "reason we would deny [sewer] service, if we can reasonably provide it."[206]

For example, West Columbia provided sewer and water service to the Jenni Lynn Assisted Living Facility for years, before the City ultimately annexed it.[207]  In the recent past, the City also provided sewer service to a residential development called Saluda Commons, outside

[203] West Columbia 30(b)(6) Depo. 6:14-13:6. (See transcript filed at Fn. 104.)
[204] Connelly Depo. 145:6-12; 151:20-154:1. (See transcript filed at Fn. 107.)
[205] McKinnon Depo.  176:25-177:10. See Ex. 30 at fn. 131.

PDF created with pdfFactory trial version www.pdffactory.com

of its corporate limits and without requiring annexation.[208]   The City has also provided utility service to Quail Ridge, a large, higher-end residential development originally outside its jurisdictional borders.[209]   The evidence is clear that West Columbia has frequently provided utility service to many businesses and residences outside of its corporate limits, and the City even had a long standing practice of charging different tap fees to in-city versus out-of-city users.[210]

Thus, it is no defense that West Columbia had no obligation to provide sewer service to Tanners Crossing because it was originally outside corporate limits.   "Once a city decides to provide services, it must do so in a racially nondiscriminatory manner."  *Crenshaw v. City of DeFuniak Springs,* 891 F.Supp. 1548, 1552 (N.D. Fla. 1995).  A Fifth Circuit case is on point:

> [O]nce a municipality begins to offer services beyond its incorporated area, it can no more refuse those services to an "outsider" for racial reasons than it can refuse those services for racial reasons to its very own residents.  While a city may have no obligation in the first instance to provide services to anyone outside of its geographical limits, once it begins to do so, it must do so in a racially nondiscriminatory manner.

*United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 808 (5th Cir. 1974).

No West Columbia witness has identified any council meeting where the City passed a policy that it would not provide sewer and water to entities outside of its borders, where the requesting party was in close proximity to existing utility lines.  Indeed, the City has no written policy in this regard.[211]   The lack of a written, confirmed policy on the provision of extra-

---

[206] West Columbia 30(b)(6) Depo. 27:7-21. (See transcript filed at Fn. 104.)
[207] West Columbia 30(b)(6) Depo. 18:19-20:23; 21:21-22:8. (See transcript filed at Fn. 104.)
[208] Varn Depo. 43:20-45:17.
[209] See Unthank Depo. 30:1-32:4; (See transcript filed at Fn. 61.) Varn Depo. 50:11-51:5.
[210] See Cauthen Depo. 11:11-12:15. This ordinance had been in effect "for a long time."
[211] Cunningham Depo. 51:25-52:7.

PDF created with pdfFactory trial version www.pdffactory.com

territorial utility service renders suspect the City's *ad hoc* and selective decision to deny sewer availability to Tanners Crossing.

When a city provides utility services to some, but denies it to other, similarly situated entities, its conduct is improper. *See Fallon Paiute-Shoshone Tribe v. City of Fallon*, 174 F.Supp.2d 1088 (D. Nev. 2001)(court rejected city's argument that it could extend service as far as its geographic borders, and found an Equal Protection where the city refused to service a Native American development while providing similarly situated entities with utilities.) In this case, there is ample evidence that the City's favorable treatment of other projects outside of its borders, compared to its disfavored treatment of Tanners Crossing, had no legitimate basis.

2. *The City Offered to Provide Water Service Only to Tanners Crossing.*

West Columbia's entire theory that a property owner must consent to annexation before providing utility service is undermined by its very own certification, through a June 14, 2004 letter from Joe Owens to Connelly, that it would only provide water service.[212] As Owens stated when questioned about supplying water service to the Property, "I could've made that day one."[213] The purpose of the letter was to draw "a distinction between water availability and sewer availability."[214] However, before sending out this letter, West Columbia did not require Connelly to sign anything that stated it had to agree to annexation. Thus, in this very instance West Columbia violated its supposedly sacrosanct policy of requiring consent to annexation before providing utility access.

3. *The Property's Annexation Moots West Columbia's Sewer Letter Defense.*

In any event, West Columbia's argument that it has no obligation to provide utility service to extra-territorial property is irrelevant—the City ultimately annexed the Tanners

---

[212] Owens Depo. Ex. 107.
[213] Owens Depo. 31:14-32:12.

PDF created with pdfFactory trial version www.pdffactory.com

Crossing site anyway (thereby triggering restrictive zoning to block multi-family use). As the annexation of the Property itself violated the FHA, the legitimacy or not of the City's prior refusal to provide a sewer letter is beside the point.

D. The City had Enough Information to Issue the Sewer Letter.

1. *Connelly Requested the Sewer Letter for Months Prior to May 2004.*

In February 2004, David Christmas, Connelly's employee, gave sample water and sewer letters to West Columbia and requested their issuance.[215] He requested again in early March via fax, and left a message for then Zoning Administrator and City Clerk McKinnon.[216] On May 7, 2004, Christmas left another message about the sewer letters for McKinnon and was referred to Utility Director Owens.[217] On May 18, 2004, Christmas talked to Owens about the request, and Owens said he had been directed to not provide the letter.[218] Therefore, if West Columbia had any problems with the sewer letter's content, it had months to notify Connelly. That it failed to do so until Owens's June 14, 2004 letter indicates there was no real capacity problem.

2. *The Letter did not Require a Commitment from the City.*

The requested water and sewer letter did not require the City to commit to anything. The requested letter had five parts. Part one simply sought information from the City that it was "capable" of providing sewer and water.[219] There is no question that West Columbia was "capable" of providing such service; after all, it had "ample" sewer capacity.

---

[214] Owens Depo. 32:13-22.
[215] Christmas Depo. 56:1-57:14; 61:15-63:8.
[216] *Id.*
[217] McKinnon Depo. Ex. 1.
[218] Christmas Depo. 95:20-97:6.
[219] Owens Depo. Ex. 107 at fn. 212.

PDF created with pdfFactory trial version www.pdffactory.com

In part two, the letter sought verification that the sewer line was within 300 feet of the site boundary.[220]  Ultimately, West Columbia had to agree with this point and stated as much in Owens's June 14, 2004 letter.

Part three asked that service was not contingent upon annexation.[221]  As discussed above, there is no evidence that the City Council enacted a policy requiring site annexation as a prerequisite to provide utilities.  Regardless, the annexation question was moot at this point because, by June 2004, West Columbia was in the process of annexing the Property and in fact completed the annexation by June 15, 2004—the day after Owens issued his letter stating the City would only provide water service.

Part four sought confirmation that the provision of water and sewer were not contingent upon expansion of West Columbia's "service area" or its "current plant."[222]  The Property clearly existed within the West Columbia service area, as West Columbia was already serving the Jenni Lynn Assisted Living Facility next door.  West Columbia did not own its own plant, but bought capacity from the City of Columbia,[223] so this second item was a non-issue as well.

Finally, the letter asked for confirmation that water and sewer service was "not contingent upon funding to the utility provider from an outside source."[224]  There is no evidence that West Columbia would have had to obtain money from some other source to provide sewer service to the Property.

Therefore, West Columbia had no legitimate reason to delay signing the sewer and water letter.

---

[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] Cunningham Depo. 46:17-21.

PDF created with pdfFactory trial version www.pdffactory.com

3.    *It is not Unusual for Such Letters to be Requested of a City.*

Craig Waites, the realtor for the Baughmans, is an experienced commercial real estate broker and agent.[225]  Waites testified that it is not unusual for developers to request letters from municipalities certifying that water and/or sewer service would be available to a project, and that it is understood that such letters are of a preliminary nature and not binding commitments.[226]  Joyce Munsch, the former Zoning Administrator of Lexington County, stated it was common for developers to ask for similar letters regarding zoning well prior to the time of formal permitting.[227]  Thus, West Columbia certainly understood that the sewer letter was not a request to approve actual hook-up of sewer for Tanners Crossing.  Thus, West Columbia's arguments that is needed more information to sign this letter are specious at best, since such letters are commonly known to not be formal commitments.

E.    <u>Summary of Pretext Evidence.</u>

The evidence of pretext is overwhelming, and overlaps with some of the evidence of intentional discrimination.  Thus, any possible validity that the annexation and zoning of the Hook Avenue area may have had under state law is undermined by the clandestine maneuvers of Harmon and Unthank and prevailing sentiment in West Columbia that Tanners Crossing would attract "undesirables."  Further the contemporaneous representations by West Columbia that it had "ample sewer capacity" in the area; its long-time knowledge of but inaction regarding any capacity issue; its failure to mention the capacity issue until after it became evident that the Project could be built under Lexington County standards, unless blocked by the City's

---

[224] Owens Depo. Ex. 107 at fn. 212.
[225] Waites Depo. 83:23-85:2.
[226] *Id.*
[227] Munsch Depo. 10:24-11:10. Notably, this was the only circumstance in her three years as Lexington County Zoning Administrator where her superior voided such a letter issued by her.  Depo. 32:7-15.  This supports the inference that West Columbia was interfering with the project with Lexington County, which had "committed" to keep West Columbia informed on the status of Tanners Crossing, *supra.*

PDF created with pdfFactory trial version www.pdffactory.com

annexation; that West Columbia never mentioned a sewer capacity issue to any other potential customer prior to considering Tanners Crossing; and the fact that West Columbia now relies on different explanations for its refusal to sign the sewer letter than the capacity issue, are all evidence of pretext.

Moreover, West Columbia had provided other developments and businesses, including the Jenni Lynn Assisted Living Facility, sewer service outside of its city limits, the City never provided a written policy that it required annexation before providing water and sewer service, and then even if it had such a policy, it violated it by issuing a water letter to Connelly. Finally, the City had known of the sewer letter request for months before deciding not to act on it, the sewer letter was plainly not a commitment to provide sewer, and it was not unusual for such letters to be requested by developers.

Combined with the evidence of intentional discrimination, unquestionably there is substantial evidence of pretext.

## VI.     Plaintiff Davis has stated Sufficient Damages for a FHA claim.

The City alleges that individual plaintiff Janice Davis should be dismissed as she does not request damages. That is not accurate. In her deposition, Davis stated that if the jury decided to award her damages, she would take them.[228]

Further, a FHA plaintiff is entitled to nominal damages at a minimum. The Supreme Court has addressed the issue of nominal damages and found:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making **the deprivation of such rights actionable for nominal damages** without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to

---

[228] Davis Depo. 22:6-10.

PDF created with pdfFactory trial version www.pdffactory.com

compensate actual injury or, in the case of exemplary or punitive damages,
to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. 247, 266 (U.S. 1978)(emphasis added).  This principal applies to cases brought under the Fair Housing Act.  *Cabrera v. Fischler*, 814 F. Supp. 269, 276-277 (D.N.Y. 1993) (granting nominal damages for a proven violation of the Act.).  As such, should Ms. Davis prevail she would at a minimum be entitled to nominal damages for Defendant's violation of the FHA.

Finally, Davis would be entitled to the declaratory and injunctive relief as would any other plaintiff in this matter.  Therefore, the motion for summary judgment against her claims must be denied.

## VII.    Dismissal of the Declaratory Judgment Claim is Inappropriate.

Dismissal of Plaintiffs' declaratory judgment claim is sought because Connelly no longer has an option on the Property.  However, the case cited by West Columbia, *Marks v. City Council of Chesapeake*, 723 F.Supp. 1155, 1159 (E.D. Va. 1988) is distinguishable.  First, because all Plaintiffs (including NAHB)[229] have sought damages, *Marks* is distinguishable as a matter of law.  Second, although Connelly has terminated its option, the property has not closed and changed ownership.[230]  Therefore, it is still subject to being developed by Connelly.  It

---

[229] Plaintiff NAHB has not sought actual damages under the relief requested portion of the Amended Complaint at ¶78.  However, Plaintiff NAHB has alleged at ¶16(e) that "[t]he City's actions as described herein have required and will require NAHB to expend additional resources to monitor, investigate, address and/or counteract the City's unlawful conduct."  Thus, NAHB has noted it has a loss of actual damage, although it does not seek these damages specifically.  Killmer Depo. 43:3-12. NAHB believes that this preserves its right to seek nominal damages, and West Columbia has not sought dismissal of NAHB on the grounds that it only has a claim for declaratory judgment, costs and attorney's fees.  Nonetheless, Plaintiff NAHB seeks leave to amend the Amended Complaint pursuant to Rule 15(a) for it to seek nominal damages, which if granted would moot West Columbia's dismissal argument as to the declaratory judgment claim.  *Lane v. Reid*, 559 F. Supp. 1047, 1052-53 (S.D. N.Y. 1983)(court allowed plaintiff who had not originally sought damages to amend complaint to seek nominal damages when it found declaratory judgment became moot.)  It is well settled that even if issue for which a party seeks declaratory relief is mooted, if nominal damages may be awarded, the party's claim remains justiciable.  *Covenant Media Of South Carolina, Inc. v. North Charleston,* 2007 WL 1953381 n.4 (4th Cir. 2007) *citing Henson v. Honors Committee of U. Va.*, 719 F.2d 69, 72 n.5 (4th Cir. 1983).
[230] Baughman Depo. 106:22-108:5.

71

PDF created with pdfFactory trial version www.pdffactory.com

would have been impractical for Connelly to maintain an option for the years that this litigation has taken to worm its way through the legal system.  Should the declaratory relief be granted, and the zoning of the Property reverted to multi-family, Connelly, or any member of NAHB, could then attempt to purchase the property from the Baughmans or purchase the option they gave on the Property to a third person.

It is axiomatic that a city's discriminatory actions cannot stand under law.  However, in the absence of a declaration by this Court, even a damages award to the Plaintiffs would not necessarily deter the City's conduct, as the discriminatory zoning of the Property would remain in effect. Then, for example, no multi-family housing could ever be built on the Property, which directly affects Connelly's ability to build multi-family housing there and prevents Janice Davis from living in multi-family housing there.  Thus, the continuing effect of this discriminatory zoning decision is still an ongoing controversy.  *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 327-28, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000); *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 131-32 (3rd Cir. 2002)(local government's action created 'ongoing injury.')  Thus, under the circumstances of this case, there is a sufficient controversy for this declaration to be made.

Further, *Marks* is distinguishable because in this FHA case, Connelly and NAHB have standing to assert the rights of the African-American citizens who live in West Columbia.[231]  *In re Malone*, 592 F. Supp. 1135, 1155 (D.C. Mo. 1984) ("[E]ven though the developer plaintiffs are not black, they have standing to assert the rights of black persons under the Fair Housing Act.")  *See also Sisters of Providence of St. Mary v. City of Evanston,* 335 F.Supp. 396 (N.D. Ill. 1971) (refusal of city to rezone from single family to multi-family.)  For example, a plaintiff may

---

[231] See Plaintiffs' Memo in Opposition to Defendant's Motion to Dismiss (alleging lack of standing) at Docket No. 43 and Judge Perry's Order denying such motion and granting standing to Plaintiffs at Docket No. 58.

PDF created with pdfFactory trial version www.pdffactory.com

make an FHA claim against a municipality even where no specific project is at issue. *See Dews v. Town of Sunnydale,* 109 F.Supp. 2d at 560 (Plaintiffs could challenge town's general actions "excluding multi-family housing and affordable single-family housing and imposing one-acre zoning.")

Thus, because Connelly and NAHB are asserting the rights of those persons who still would be affected by the discriminatory zoning, declaratory relief is appropriate to vindicate the rights of those minorities. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n.9, 99 S.Ct. 1601, 1609 n.9, 60 L.Ed.2d 66 (1979)("The central issue at this stage of the proceedings is not who possesses the legal rights protected by [the FHA], but whether respondents were genuinely injured by conduct that violates *someone's* [the FHA] rights...")(emphasis in original.) Plaintiffs ask that the Court apply the declaratory relief sought in this fashion as to the Property.

West Columbia's motion that the declaratory judgment portions of this lawsuit be dismissed must therefore be denied to the extent the declaratory judgment concerns the zoning of the Property.

## VIII.    There is Sufficient Evidence for the Jury to Consider Punitive Damages.

West Columbia has incorrectly asserted that plaintiffs have not offered evidence to support punitive damages in this case as a matter of law. Punitive damages are recoverable under the Fair Housing Act. See 42 U.S.C.A. § 3613(c)(1) (West 1994). The Fourth Circuit has held that punitive damages are recoverable under the Fair Housing Act "when the defendant's conduct is motivated by evil motive or intent, **or when it involves reckless or callous indifference to the federally protected rights of others**." *Pumphrey v. Stephen Homes, Inc.,* 110 F.3d 60 (Table), 1997 WL 135688 *2, 1997 U.S. App. LEXIS 5500 at *2 (4th Cir. 1997) (emphasis added).

PDF created with pdfFactory trial version www.pdffactory.com

There is no need to show egregious or malicious conduct to obtain punitive damages. "That because the jury's finding of a violation under the Fair Housing Act necessarily encompasses a finding of intentional discrimination, the plaintiffs need not also demonstrate that the conduct was particularly egregious or malicious in order to obtain punitive damages." *Walker v. Todd Vill, LLC*, 419 F. Supp. 2d 743, 749 (D. Md. 2006) *quoting Alexander v. Riga*, 208 F.3d 419 (3rd Cir. 2000), *cert. denied*, 531 U.S. 1069, 121 S. Ct 757, 148 L. Ed. 2d 660 (2001). "But importantly, malice 'and **reckless indifference**,' in this context . . . refer not to the egregiousness of the landlord's conduct, but rather to the [defendant's] **knowledge that it may be acting in violation of federal law**." *Walker* at 749, (quoting *Alexander*, 208 F.3d at 431) (emphasis added).

As stated *supra*, the record is replete with facts that demonstrate intentional discrimination in this case, or at least show some intent as part of the discriminatory impact analysis. As such, it is clear that a jury could very easily conclude that based on the law and facts of this case, the Plaintiffs should be awarded punitive damages. Therefore, punitive damages are appropriate in this case, and Defendant's Motion for Summary Judgment as to this issue should be denied.

## CONCLUSION

There is overwhelming evidence of West Columbia's discriminatory intent and the resulting discriminatory impact of its actions in interfering with, and ultimately defeating, the Tanners Crossing low to moderate income housing project. The City's positions in its Motion are at best for cross-examination and jury argument. The Court should deny the City's Motion and order that this lawsuit be set for trial.

PDF created with pdfFactory trial version www.pdffactory.com

Respectfully submitted this 31st day of August, 2007;

McNAIR LAW FIRM, P.A.

By: s/Benjamin E. Nicholson, V
Benjamin E. Nicholson, V (Fed ID #4958)
McNair Law Firm, P.A.
Post Office Box 11390
Columbia, South Carolina 29211
803.799.9800
*Attorneys for Plaintiffs*

Of Counsel:

Duane Desiderio
Mary Lynn Huett
National Association of Home Builders of the United States
1201 15th Street, NW
Washington, D.C. 20005
(202) 266-8200

COLUMBIA 896291v5

PDF created with pdfFactory trial version www.pdffactory.com